24 C.C.P.A.(Patents)

## EMERSON ELECTRIC MFG. CO. v. EMERSON RADIO & PHONOGRAPH CORPORATION.*

Patent Appeal No. 3779.

Court of Customs and Patent Appeals.
April 5, 1937.

Lawrence C. Kingsland, of St. Louis, Mo. (Edmund C. Rogers and Estill E. Ezell, both of St. Louis, Mo., of counsel), for appellant.

Darby & Darby, of New York City (Samuel E. Darby, Jr., and Louis D. Fletcher, both of New York City, of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

Emerson Radio & Phonograph Corporation, a corporation of the State of New York, applied to the United States Patent Office for the registration of a trade-mark for radio sets and apparatus, television sets and apparatus, etc., on September 12, 1933. It is said in the application that this mark has been used in connection with the selling of radio sets and apparatus, television sets and apparatus, radio television sets and apparatus, and radio phonograph combinations, since about July 1, 1927.

The mark consists of a representation of a treble clef, together with the words "Emerson Radio and Television." No claim is made to the words "Radio and Television" apart from the mark, as shown. The words are superimposed upon the lower part of the clef.

The Emerson Electric Manufacturing Company, a corporation of the state of Missouri, filed notice of opposition to the application, alleging that it is the manufacturer of electrical equipment, including, among other items, the following: "electric motors, electric fans, including portable, wall, ceiling, floor and exhaust types, furnace blowers, forge blowers, organ blowers, and hair driers, electric generators, electric motor-generators, electric switches, including manually operated and automatically controlled types, rotary transformers, illuminating cylinders, electrically operated coffee mills, electrically operated air and water pumps, electrically operated lathes, electrically operated buffers and grinders, electrically operated dental engines, electric power units for sewing machines, electrically operated humidifiers, electrically operated air washers, and radio 'B' power units."

The opposer states that since in or about 1890 its business has been conducted under the present or substantially the same name, including prominently the word "Emerson" as its distinctive feature; that its products have been marketed with and known by the name "Emerson," and have been extensively advertised; that this name has been used continuously since its initiation; and that it has built up a valuable good will.

The opposer also states that it is the owner of three registered trade-marks, namely, a trade-mark consisting of the block letters "Emerson," registered August 15, 1916, for the following: " * * * electric motors, electric fans, including fans of portable, wall, ceiling, and floor types, electric exhaust-fans, electric forge-blowers, electric generators, electric motor-generators, knife-switches, switchboards, panelboards, fuse-boards, transformers, rotary transformers, illuminating-cylinders, watch-demagnetizers, electric organ-blowers, electric hair driers, electrically-operated coffee-mills, electrically-operated air and water pumps, electrically-operated lathes, electrically-operated buffers and grinders, elec-

---

*Appellant's petition for rehearing granted without reargument May 29, 1937. Decree affirmed on reargument 90 F.(2d) 331.

trically-operated furnace blowers, electrically-operated hacksaws, and electric motors and power-transmitters for sewing-machines, in Class No. 21; Electrical apparatus, machines, and supplies"; a trade-mark consisting of the word "Emerson," registered September 5, 1916, "for dental lathes, dental engines, and buffers and grinders for dentists' use, * * * Dental, medical, and surgical appliances." Both of the foregoing trade-marks were registered under the ten-year clause of the Trade-Mark Act of 1905. Ownership is also pleaded of a trademark consisting of a representation of a pyramid, with the words

"Fans
Emerson
Motors
Built to Last,"

registered June 9, 1925, "for nonoscillating electric fans, oscillating electric fans, electric ceiling fans, electric column fans, electric ventilating fans, electric exhaust fans, and electric motors."

The ordinary allegations of confusion in origin are made.

The parties took testimony. The appellant, on its part, showed that the scope of the distribution of its products was nationwide and had been such for a long period; that distribution was initiated in 1900 and extended to 1905; that extensive advertising had been carried on; that the mark "Emerson" for dental, medical, and surgical appliances had been used continuously since 1924, the same name plate having been used on generators, fans, and electrical appliances; that the same name plates were used in motor generator sets for use with radio in 1921. From 1921, motors have been produced which have a name plate bearing the word "Emerson" prominently displayed thereon. Motors have been supplied for use with television apparatus, showing the word "Emerson" prominently displayed. This was about 1929.

The major part of the company's business is electric fans, distributed at retail through outlets which handle both radio and phonograph apparatus. Herbert I. Finch, a witness, testified that during the last two years quite frequently correspondence has been miscarried between the two companies, to the number of, perhaps, fifteen or twenty letters.

On cross-examination, the witness Finch testified that the special dynamotor for radio apparatus which he had mentioned in his testimony was a special dynamotor for radio work, and is the same as was referred to as the "Emerson 'B' Power Unit." These were sold directly to the consumer, and were used in place of the ordinary "B" batteries or vibrators. This power unit was placed upon the market first in 1932. The company has not patented this product, and does not manufacture complete television sets, or complete radio television receiving sets, or radio tubes. In addition to the dynamotor, the company has manufactured high-voltage generators formerly used in transmission work, and motors for driving parts of radio and television apparatus. The witness was of the opinion that the use of the products of both the appellant and appellee under the mark "Emerson" would be confusing.

Emerson Radio & Phonograph Corporation, the appellee, filed an answer, alleging that the so-called radio "B" power units were not manufactured until long after the appellee had manufactured and sold its goods, bearing its aforesaid mark, and that the appellant did not at any time prior to appellee's entry into the field sell or offer any radio parts or radio products of any kind; that the appellee has established an extensive good will; and that the various products which it manufactures are recognized by its name, which is associated with the appellee. The applicant denies that the goods manufactured by the opposer are of the same descriptive properties as those of the applicant, and denies any interference or confusion with the mark used by the applicant. The applicant claims to be the owner of five trade-mark registrations, namely, a mark consisting of the written signature, "Victor H. Emerson," registered January 25, 1916, for use with phonographic machines and sound records; a mark consisting of a representation of a treble clef; registered May 25, 1920, for use with the sale of musical instruments and supplies; a mark consisting of a representation of a shield with the word "Emerson," registered April 6, 1920, in connection with the sale of phonograph records; a representation of a treble clef, superimposed upon the words "Emerson Records," registered May 30, 1922, in connection with the sale of phonographs and phonograph records; and a trade-mark consisting of a representation of a treble clef with the words "Emerson Phonoradio," registered May 29, 1927, in connection with the sale of complete radio receiving sets adapted to combination with phonographs.

It appears from the testimony of the witness Benjamin Abrams, who is the president of the Emerson Radio & Phonograph Corporation, that he has been connected with the sale of products under the name "Emerson" since 1916. In 1916 Abrams was associated with the company as jobber of Emerson phonographs and records. These records were at first sold with the trademark "Victor H. Emerson," and about a year after business was started a trademark showing a clef and accompanied with the words "Emerson Records" was substituted.

At that time approximately six advertisements issued of various phonographs sold by the company, by which they were made known to the public. Among other advertisements at the time was one of January 10, 1920, in the Saturday Evening Post. Some time in 1921, the Emerson Company went into the hands of a receiver, and, in 1922, the company went into bankruptcy and the assets of the company were offered for sale. Abrams then purchased the assets, including the trade-marks, patents, good will, machinery, equipment, and inventory, with the exception of one patent, which were included within the company's property. Thereupon Abrams caused a new corporation to be formed, known as the Emerson Phonograph Company, Inc., to which was at once transferred all the assets which had been acquired by Abrams from the Emerson Phonograph Company, Inc. This new company engaged in the business of manufacturing phonographs and phonograph records. In 1923, the company initiated the manufacture and sale of a combination radio and phonograph, which was called the Emerson Phonoradio. This machine was extensively advertised in trade and other magazines. In 1922 Abrams made arrangements with a company in Peru, Ind., under the name of Wasmuth-Goodrich Company, whereby Emerson Phonograph Company, Inc., granted to Wasmuth-Goodrich Company the right to manufacture a phonograph and use the Emerson name thereon. In 1923, it was decided by the Emerson Phonograph Company, Inc., to manufacture a combination radio and phonograph, using the phonograph that Wasmuth-Goodrich Company manufactured, and attaching thereto, in the place of business of the Emerson Phonograph Company, Inc., a radio set, thereby forming a combination radio and phonograph. At that time the Emerson Phonograph Company, Inc., found that an application was also pending from Wasmuth-Goodrich Company in the Patent Office, to register the name "Emerson" for a combination phonograph and radio. Opposition proceedings were started, and finally the proceedings resulted in a settlement whereby the Emerson Phonograph Company, Inc., acquired the rights claimed by Wasmuth-Goodrich Company. The trade-mark was assigned and transferred to Emerson Phonograph Company, Inc.

In 1924 the Emerson Radio Corporation and the Emerson Phonograph Company, Inc., merged under the name of Emerson Radio & Phonograph Corporation. The former corporation was formed for the purpose of segregating the phonograph business from the radio business. After the separate corporations were formed, it was decided by the companies to abandon the plan of operating two separate units, because of overhead and other reasons. Emerson Radio & Phonograph Corporation, since its organization, has been engaged in the business of manufacturing and selling radios, with a small percentage of phonograph business. Many of its products have been marketed with the treble clef as a trade-mark associated with the name "Emerson." The advertising of the company amounts to as much as $100,000 a year, and its goods have been extensively advertised throughout the country. The mark has been continued upon all of its products, and at the time of hearing approximately 12,000 dealers were engaged in the selling of these products, in ten or twelve countries. Mr. Abrams stated that in his knowledge of the business he had never known of any confusion in mail, or otherwise, between the two contesting companies. The products are sold in music, radio, hardware, and automotive stores, and, in some cases, drug, department, and furniture stores. The company sells only repair parts for the instruments it also sells, and does not make a business of manufacturing parts. The parts are largely purchased from other manufacturers.

The Examiner of Interferences was of the opinion that the opposition should be sustained and that the registration ought not to be allowed. On appeal, the Commissioner of Patents reversed the decision of the Examiner.

The principal controversy in this case arises out of the date when the parties entered the particular field in which the ap-

pellee is now engaged; namely, the manufacture of radios and phonographs. The opposer, by its testimony, attempts to prove that it was in this field at·least as early as the appellee. This the appellee denies. Both parties took testimony. The Commissioner of Patents made these observations upon the point at issue:

"It seems to me the goods involved in the instant proceeding are as different as were those disclosed in either of the cited cases. It is to be noted that applicant's description of goods is quite specific, and that the only 'parts' of its various receiving sets to which its mark is applied are tubes, eliminators and loud speakers. Probably opposer's 'radio "B" power units' could properly be called radio parts, though the record is somewhat hazy in that regard; but it is fairly apparent that their manufacture was only temporary, that it occurred after applicant's established use of its mark on the goods described in the application, and that it had been permanently discontinued before the application was filed. It follows that with respect to this particular item opposer's trade-mark was not 'owned and in use' by it so as to prevent registration to applicant under the provisions of section 5 of the Trade-Mark Act [as amended (15 U.S.C.A. § 85)] even though it be assumed·that the goods were of the same class as those of applicant."

Counsel for appellant contend that radio parts were made by it before the appellee engaged in the general making of radio parts. The testimony of the witnesses shows that in a circular issued by the appellant in 1922, a motor generator adapted for radio work, was advertised for sale. We have examined the circular with some care, and find an illustration of such a motor. However, there is no statement that this motor generator is not suitable for other purposes, and, in so far as its appearance is concerned, it might well be used for other purposes. It does not appear that the appellant engaged in the making of any apparatus, especially adapted to and suitable for radio purposes, until 1930, when fans, with radio speakers attached, were offered for sale in the catalogs of the 'appellant. On one occasion, in January, 1924, the appellant offered for sale what was called "Gabels Automatic Entertainer," a sort of a music box, similar to a phonograph.

The real production of radio power units by the appellant began about 1932, and consisted of sales of special dynamotors which were used in lieu of "B" batteries or vibrators, in conjunction with small independent units of electric energy production. The testimony shows that the appellant has never been actively engaged in the production of radio receiving sets, or in any radio parts, except such production as has been mentioned in radio dynamotors.

This production was entered upon at a time long succeeding the entrance of the appellee into the field. Since 1924 it had been continuously and increasingly producing radio receiving sets, until its reputation and business had largely increased along these lines.

These corporations have been following their chosen lines for many years, without apparent conflict. A few letters have miscarried in the mails or have been misdirected, but such confusion seems to have been without serious consequences. Both parties have honestly built up valuable and extensive businesses. There seems to be no reason why they should not be permitted to continue to do so and to use the marks which have become familiar to the users of their goods.

The particular trade-mark which the appellee is attempting to register at this time is distinctive. The mark consists of several features, a striking feature of which seems to be the representation of a treble clef associated with the word "Emerson." The appellee entered the radio field first, and, considering the character of ·the goods of the respective parties at that time, no good reason appears why it should not be permitted to register its mark.

We observe that the mark sought to be registered contains the words "Radio and Television," which are disclaimed. We fail to find in the record any statement that the appellee is engaged in the sale or manufacture of television equipment. It is suggested to the Commissioner of Patents that it may be necessary to cause this application to be so amended as to omit the word "Television" on the return of the case to the Patent Office.

In our opinion the Commissioner of Patents came to the right conclusion, and his decision is affirmed.

Affirmed.

HATFIELD, Associate Judge, did not ·participate in this case.