## EMERSON ELECTRIC MFG. CO. v. EMERSON RADIO & PHONOGRAPH CORPORATION et al.

District Court, S. D. New York.

Aug. 5, 1938.

Lawrence C. Kingsland and Edmond C. Rogers, both of St. Louis, Mo., for plaintiff.

Pennie, Davis, Marvin & Edmonds, of New York City (Estill E. Ezell, of St. Louis, Mo., of counsel), for plaintiff.

Darby & Darby, of New York City (Samuel E. Darby, Jr., Louis D. Fletcher, and David Williams, all of New York City, of counsel), for defendant.

GODDARD, District Judge.

This is a suit for alleged trade mark infringement and for unfair competition, specifically infringement of trade mark registration No. 111,931 of August 10, 1916, and No. 199,433 of June 9, 1925; also under the common law of trade marks.

The Emerson Electric Manufacturing Company is a manufacturing company located in St. Louis, Missouri, where it has its principal office, although it has branch offices in several cities in the United States including New York City. The two corporate defendants, the Emerson Radio & Phonograph Corporation and the Emerson Television-Radio, Inc., are New York corporations and have their offices in New York City; the individual defendant, Benjamin Abrams, is President of both of the corporate defendants.

For the proper consideration of the case it is necessary to have a history of the parties and the articles which they have respectively been manufacturing and selling. The plaintiff, the Emerson Electric Manufacturing Company, was founded in St. Louis, Missouri, in 1890. J. W. Emerson gave his name to the company and became its first President. Since 1890 the plaintiff has used the name "Emerson" as part of its corporate name and as a trade mark upon the goods manufactured by it. On August 15, 1916 the defendant obtained registration No. 111,931 for the name "Emerson" under § 5 of the 1905 Trade Mark Act, 15 U.S.C.A. § 85, the name "Emerson" being a proper name. On June 9, 1925 plaintiff registered the name "Emerson" in combination with a pyramid background consisting of the representation of a pyramid superimposed upon which were the words

"Fans
Emerson
Motors
Built to Last"

and the plaintiff states the present suit is founded essentially on this trade mark of August 15, 1916.

From its earliest days the plaintiff manufactured "Emerson" electric fans, which continues to be its chief product, but its products include motors, electric generators, electrically operated washing machines, coffee mills, and the like. In 1926 plaintiff's engineering department constructed either two or three radio sets as an experiment, but they were not put on the market. With this exception plaintiff has never manufactured or sold any radio sets or phonographs. The plaintiff has for years advertised extensively and its products have been sold generally throughout the United States and in foreign countries.

The Emerson Radio & Phonograph Corporation sells Emerson radios procured from the Emerson Television-Radio, Inc. Emerson Television-Radio, Inc., manufactures all the radios for Emerson Radio & Phonograph Corporation. The corporate defendants, Emerson Radio & Phonograph Corporation and the Emerson Television-Radio, Inc., are so closely related that for practical purposes in this suit they will be referred to as the defendants, manufacture and sell the "Emerson" radio and combination radio and phonograph, and are the successors to the Emerson Phonograph Company which was started by Victor A. Emerson in 1915 which, at that time, made the Emerson phonograph records and accessories, for which registration of his name as a trade mark was effected June 25, 1916, No. 108,287. This mark consisted of the words "Victor H. Emerson" in script which was used continuously since July 1, 1915 in connection with phonographic machines and sound records. Additional marks were adopted and used. These were No. 130,063, registered April 6, 1920—a mark consisting of a representation of a shield in black and white with the word "Emerson" across the top used in connection with the sale of phonograph records continuously since May, 1918. · No. 131,902 registered May 25, 1920—a mark consisting of a treble clef used since July 1918. No. 155,412 registered May 30, 1922—a mark consisting of a treble clef superimposed upon a phonograph record and the words "Emerson Records" used in connection with the sale of phonographs and phonograph records since June 3, 1918. No. 225,976 registered March 29, 1927—a mark consisting of a treble clef with the words "Emerson Phonoradio" and a scroll underneath, used since March 14, 1924 in connection with the sale of complete radio receiving sets adapted to combination with phonographs. This mark was registered by the Wasmuth-Goodrich Company, furniture manufacturers, who made the cabinets for the defendant on which the name "Emerson" as part of the manufacturing process was placed and who, for this reason, filed the application. But defendant acquired on September 20, 1928 by assignment, all rights to this mark.

In 1921 the Emerson Company became involved in financial difficulties, which resulted in an equity receivership. Mr. Abrams, who had been a large distributor with the Emerson Phonograph Company, purchased the assets and has uninterruptedly continued this business since that time.

In 1923 the defendant commenced producing combined radios and phonographs which were sold under its trade mark. It also began the manufacture and sale of radio receiving sets which it also sold under its trade mark and since then has been actively engaged in manufacturing and selling both of them. The defendant held licenses from the Radio Corporation of America under which it was licensed to manufacture television apparatus as well as radios under the patents of that company and its associated companies. With the probable advent of television, the defendant on September 12, 1933 applied for registration of its well known trade mark for television and combined radio and television equipment, which it alleged it had been continuously using since July 1, 1927, consisting of a treble clef, under which were the words "Emerson Radio and Television". The application was allowed and published by the Patent Office, although plaintiff opposed on two grounds—(1) that the products of the plaintiff and of the defendant were legally similar; (2) that confusion had occurred or was likely to occur between the products of the respective parties if the same name "Emerson" was used, as plaintiff had marketed its goods with the name "Emerson" displayed on them since about 1890 and was the owner of the trade marks registrations No. 111,931, dated August 15, 1916; No. 112,-418 dated September 5, 1916, and No. 199,-433 date June 9, 1925. Testimony was taken by both sides and the opposition proceeding was carried to the Court of Customs and Patent Appeals, which held in favor of the defendant and trade mark registration No. 349,887 was issued on September 15, 1937 to the defendant for its old trade mark as applied to radio-television. On April 4, 1936, while the opposition proceedings were pending in the Court of Customs and Patent Appeals, the plaintiff filed the bill of complaint in the suit at bar, which was the first protest against the defendant's use of its old trade mark on radio or phonographs, or assertion that such use constituted infringement of any rights of the plaintiff.

In the period from 1922 to April 30th of the present year (1938) the defendant has sold throughout the United States upwards of 2,000,000 radio receiving sets and "phonoradios", representing a total sales

value of $30,344,082 and has expended $2,560,950 in advertising and sales promotion. The advertising was carried on in the public press, nationally known magazines, trade journals, bill posters, ·radio broadcast, etc. The yearly figures indicate a gradual and fairly constant growth in reputation and amounts of sales are as follows:

| Year | Sales | Advertisement and Sales Promotion |
|---|---|---|
| 1923 | $ 304,604 | $ 40,483 |
| 1923–1924 | 581,042 | 59,204 |
| 1924–1925 | 428,322 | 52,911 |
| 1925–1926 | 335,231 | 25,493 |
| 1926–1927 | 541,300 | 44,529 |
| 1927–1928 | 946,144 | 44,991 |
| 1928–1929 | 1,202,892 | 91,452 |
| 1929–1930 | 1,518,169 | 83,785 |
| 1930–1931 | 1,636,160 | 91,682 |
| 1931–1932 | 1,410,496 | 96,319 |
| 1932–1933 | 1,961,111 | 158,525 |
| 1933–1934 | 2,552,651 | 219,624 |
| 1934–1935 | 3,555,239 | 255,017 |
| 1935–1936 | 4,546,328 | 416,131 |
| 1936–1937 | 6,101,206 | 633,663 |
| 1937 to April 30, 1938 | 2,923,187 | 247,143 |
| | $30,344,082 | $2,560,952 |

Thirty per cent of these sales were in the City of New York and about thirty per cent of defendant's advertising was in New York City. The rest of the sales and advertising were general throughout the United States. From 1923 to the present time approximately 60,000 of the defendant's Emerson radios had been sold in St. Louis where the plaintiff's principal place of business has been located since its formation, and approximately 100,000 of its Emerson radios have been sold in Chicago. During this period defendant spent for advertising $25,000 in St. Louis and $76,000 in Chicago. Since 1931 defendant has held licenses under various patents from the Radio Corporation of America, the American Telephone & Telegraph Company, Western Electric Company, General Electric Company, and the Westinghouse Electric Manufacturing Company. According to the figures of the Radio Manufacturing Association, defendant has sold twenty five per cent of all the radio sets sold by licensees of the Radio Corporation of America, representing virtually one hundred per cent of the radio receivers manufactured in the United States. The defendant has, through the years, established itself as the largest manufacturer in the world of small radio receivers which it sells at moderate prices. The defendant has never manufactured or sold motors, generators, or fans.

In defense to this suit the defendant asserts—

1. The plaintiff is not possessed of any exclusive trade mark rights to a common surname.

2. Plaintiff's trade mark is limited in scope and does not apply to defendant's products.

3. That there is no infringement

4. That there is no confusion (deception or injury).

5. Plaintiff is estopped by the decision of the Court of Customs and Patent Appeals.

6. Plaintiff's acquiescence and laches would bar equitable relief even if it had any rights which were trespassed upon.

The decision of the Court of Customs (Emerson Electric Mfg. Co. v. Emerson Radio & Phonograph Corp., Cust. & Pat.App., 89 F.2d 349; Id., Cust. & Pat. App., 90 F.2d 331) is not res adjudicata whatever its prima facie validity until successfully overcome. Dwight & Lloyd Sintering Co., Inc. v. Greenawalt, 2 Cir., 27 F.2d 823. But the defendant urges that the "Plaintiff is here estopped by the judgment of the Court of Customs and Patent Appeals" and says that the proceedings in the Court of Customs and Patent Appeals were to prevent defendant's registration of its mark for television and combined radio-television equipment, while the suit at bar is for alleged trade mark infringement, but that to sustain its opposition to the registration of defendant's mark, plaintiff put in issue in the Court of Customs and Patent Appeals, among others, the following:

1. "Plaintiff's exclusive ownership of the mark 'Emerson'"

2. "The identity or similarity of descriptive properties of the products of plaintiff and defendant"

3. "Actual confusion or likelihood of confusion resulting from the use of the same names by the parties on their respective products",
and that the judgment of the Court of Customs and Patent Appeals was adverse to plaintiff on each and all these issues.

Defendant further contends that inasmuch as plaintiff's present case is dependent upon its ability to prove exclusive ownership of the name "Emerson", similarity or identity of the descriptive properties of the products of plaintiff and defendant, and confusion resulting from their respective use of the same name as a trade name on their products, the estoppel, as to these three issues, requires a dismissal of the bill of complaint. In support of its position on this defense of estoppel, counsel for defendant rely largely upon the case of John Morrell & Co. v. Doyle, 20 F. Supp. 110, but this decision has recently been reversed. See John Morrell & Co. v. Doyle, 7 Cir., 97 F.2d 232.

■■ Whether this limitation be referred to as res adjudicata or as estoppel by judgment, I think the plaintiff is not precluded from presenting to this court evidence bearing up these questions and that while this court is not bound by the decisions of the Court of Customs and Patent Appeals, such decisions should not be disregarded unless clearly erroneous. Cf. United Shoe Machinery Corporation et al. v. Muther, 1 Cir., 288 F. 283; B. F. Goodrich Co. v. Kenilworth Mfg. Co., Cust. & Pat.App., 40 F.2d 121.

The next questions presented are— whether the plaintiff's trade mark, which it affixes to the class of articles which it manufactures, is infringed by the defendant's mark on the class of articles it produces? Whether the defendant is guilty of unfair competition? And also has the plaintiff lost any rights it may have had to equitable relief through its own laches?

■■ The mark "Emerson" has been registered some forty-two times for a wide variety of articles of commerce.

"As a surname, although not susceptible of exclusive appropriation as a trade-mark at common law, frequently acquired a special signification in connection with particular articles of merchandise, Congress in recognition of this fact passed the Act of February 20, 1905, 33 Stat. 724, which authorized, with certain restrictions, the registration of surnames as trade-marks". Charles Broadway Rouss, Inc. v. Winchester Co., 2 Cir., 300 F. 706, at page 713.

So that plaintiff's mark is limited to the particular products or class of products to which plaintiff had applied it prior to the defendant's adoption and use of its name for its particular product. The right granted to the owner of a registered trade mark is a monopoly and such a monopoly should not be extended unless the owner is clearly entitled to it.

■ The plaintiff's field, during the years which it has been in business, and the articles which it has manufactured and sold included "Emerson" electric fans, which has always been its chief product; also electric motors, electric motor generators, electric generators, electric switches, rotary transformers, and the following electrically operated appliances: coffee mills, air and water pumps, lathes, buffers and grinders, dental engines, humidifiers, air washers, electric power units for sewing machines, motors for player pianos and other instruments; also furnace blowers, forge blowers, organ blowers, hair dryers. From 1931 until 1937 plaintiff manufactured and sold "B Power Units" and Dynamotors, which consist of devices interposed between the actuating electric current source and the radio receiver or phonograph, for the purpose of transforming or altering the electrical characteristic of the current supplied into the form of electric current desired. The manufacture of these power units and dynamotors for use in connection with radio receiving sets was discontinued by the plaintiff in 1937.

The articles manufactured by the defendant consist solely of radios, phonographs and television equipment. While it is true that some of the articles or electrical equipment manufactured by the plaintiff may be used in connection with radios, phonographs and television equipment, it is equally true that they are used in connection with a great number of electrically operated appliances and form no integral part of the radio, phonograph or television instrument. They are no more identified with those than they are with the Wurlitzer, Knabe or other piano or pipe organ to which the plaintiff's motor may be attached, and hardly anyone would be so bold as to say that the plaintiff had the exclusive right to use its trade mark on pianos, organs and the like.

The plaintiff called two witnesses. Neuhaus, an official of the Reading Electric Company, Flushing, Long Island, a repair agency for the plaintiff company, who said that his company never handled radios but carried equipment for motors and fans, washing machines, etc., and that for the last three or four years, on an average of two or three times a month, he received

inquiries for repairs to Emerson radios from people who thought these radios were manufactured by his company. Another witness Cella, an officer of Cuny & Gerber of New York City, jobbers in electric supplies, including those of the plaintiff, and a retailer in radios, testified that people were often confused and would ask him if the company he represented, the Emerson Electric Manufacturing Corporation, had any connection with the Emerson radios and he had to explain that there was not. Besides these witnesses, the plaintiff submitted thirteen depositions relating to incidents in various parts of the country where, subsequent to the filing of the bill of complaint, dealers handling plaintiff's goods said customers were more or less confused in the belief that Emerson radios were made by plaintiff.

Mr. Rodgers, now Chief Engineer and in charge of plaintiff's legal work, testified in 1932 he discovered that letters intended for Emerson Radio Company were being addressed to Emerson Electric Company, and that during the period of 1932 to 1936—maybe they received two, three or four such letters in a week; sometimes one a week or one letter every two weeks and that the number increased later. Plaintiff submitted no such letters from the years 1932 to 1935 but about a dozen letters dated after 1935, or rather photostats of them, which Mr. Rodgers testified were "illustrative" of others received since then.

Plaintiff's business is the manufacturing of fans; also of motors, etc., which are used chiefly for utility and commercial purposes. They are not, it seems to me, of the same general character or of the same descriptive properties as those of the defendant, which enter into an entirely different field.

It does not seem to me that it is to be reasonably anticipated that the manufacturer of electric fans, motors and electrically driven appliances will branch out into the production of radios, phonographs and television instruments, nor do I believe that the public would, under the circumstances existing, with the defendant's name and mark on it, get the impression that the defendant's radios, phonographs or television equipment were the plaintiff's products, although it is quite possible, and perhaps likely, that some few people might be confused but not enough, in my judgment, to amount to anything serious.

The plaintiff did not consider the normal expansion of its business to include radio sets and phonographs, and Mr. Finch, the Chairman of its Board, testified in the opposition proceedings that his company did not in 1924 regard the manufacture of radio sets or combination radio sets and phonographs as in the normal line of expansion of its products, and that its business policy at that time was to confine "our activities to motors and generators and fans and similar equipment".

The Court of Customs and Patent Appeals, after a full consideration of all the facts, were of the unanimous opinion that the goods of the plaintiff and those of the defendant were not of the same descriptive properties or of the same class. Not only does the plaintiff seek to enjoin the defendant from using the trade mark, which defendant obtained on its application of September 12, 1933 after the plaintiff's opposition, but from using its earlier marks which it had employed for many years without any protest on the part of the plaintiff.

The testimony as to confusion is not convincing; it consists principally of statements made by some dozen representatives of the plaintiff who said that inquiries by some of their customers indicated the belief that the Emerson radios were made by the plaintiff. In addition to this testimony was the statement by the Chief Engineer for the plaintiff, who was in charge of its legal affairs, that the plaintiff received letters which were misdirected and intended for the Emerson Radio Corporation, which was probably due to the similarity of the names of the corporations. There is no evidence that any trade has been diverted from the plaintiff to the defendant. Obviously this would not happen, as they do not make the same articles, nor is there evidence of any loss of business by plaintiff as the result of confusion.

Mr. Rodgers, employed as Chief Engineer by the plaintiff and in charge of the development of all of the plaintiff's products, testified that the first knowledge of the defendant's radio which his company had was in 1932, although Mr. Schmidt, employed by the plaintiff since 1910 and holding various executive positions, and since 1936 Vice-President of the plaintiff corporation, said that he had known of the Emerson radio since 1928 or 1929. That the plaintiff should not have been aware

of the Emerson radio before 1928 or even 1932, seems remarkable in view of the fact that the Emerson Corporation since 1923 had been selling its radios and phonographs throughout the United States in fairly large volume and that they were being nationally advertised. However, assuming such to be the fact, this is quite persuasive evidence of the absence of confusion or effect on the plaintiff's business, which inference is confirmed by the plaintiff's subsequent acts or rather failure to act. With the exception of plaintiff's protest against the defendant's application of its mark for radio and television sets, the plaintiff made no protest of any kind to the defendant until the filing of this bill of complaint on April 4, 1936. The plaintiff's opposition to defendant's application of 1933 was addressed solely to the registration of the new mark and there was no intimation on the part of plaintiff that it objected to defendant's use of its old mark on radio and phonograph sets, which defendant had been using since 1924. No opposition was filed by plaintiff when defendant filed, in 1924, its application for its mark "Emerson" for radios and phonographs and which was registered in March, 1927, and no question was then raised by plaintiff as to the right of defendant to use its previously registered marks for radio receiving sets and phonographs.

In Landers, Frary & Clark v. Universal Cooler Corporation, 2 Cir., 85 F.2d 46, at page 49, referring to a trade mark of a character that would be entitled to a broader scope, Learned Hand, J., said:

"Arguendo we will therefore take it that, had the plaintiff pressed its claims in May, 1926, it would have succeeded. It did not do so. On the contrary for five years it did nothing at all, and during those years the defendant's business had grown to a very substantial size. It had invested probably about $100,000 in advertising,—in all of which the word 'Universal' appeared,—and its capital investment had nearly doubled; it had grown from about $500,000 to $900,000. In the face of an unequivocal declaration that the defendant must not use the mark this might not have served, but the plaintiff had not made any such.

* * * * * * ·  *

"When for eight years one plans one's business on the assumption that one may use a mark, it is a grave dislocation of the business to stop its use; the whole selling organization must be recast and the market re-educated; nobody can estimate what the losses may be.

* * * * * * *

"Equity will not upset what has been founded upon such solid ground; the plaintiff has itself to thank for any confusion which may result; it is too late after all these years now to restore the parties to their relative positions at the outset."

What Mayer, J., said in the case of Valvoline Oil Co. v. Havoline Oil Co., D. C., 211 F. 189, also seems to me to apply in the case at bar. There, the plaintiff, after some eight years without objection by it, sought to enjoin the use of a trade mark by a defendant who had built up a large business. "But it cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be and then destroy with the aid of a court decree, much that the competitor has striven for and accomplished—especially in a case where the most that be said is that the trade-mark infringement is a genuinely debatable question" [page 195]. See, also, France Milling Co. v. Washburn-Crosby Company, 2 Cir., 7 F.2d 304.

In view of all the circumstances I do not think that the plaintiff needs or is entitled to the relief demanded in its bill of complaint. It seems to me that it would be inequitable to permit the plaintiff, which has never engaged in the manufacture of products similar to or competitive with the defendant's radio receivers and phonographs, to deprive the defendant of its trade mark and good will, which the defendant has built up during a long period of years through its commercial enterprise and industry and at an expense of upward of Two and half million dollars, during which time the plaintiff made no claim that its rights were being invaded by the defendant, except a very belated one. I find no evidence of unfair competition.

Accordingly the bill of complaint is dismissed.

This opinion may serve as findings of facts and conclusions of law.