434 F.Supp. 860 (1977)
ARMSTRONG CORK COMPANY, Plaintiff,
v.
ARMSTRONG PLASTIC COVERS COMPANY, Armstrong Plastic Covers Company II, Armstrong Slip Covers Company, Joe Salerno, Frank Salerno, James Salerno, and Michael Salerno, Defendants.
No. 75-2C(3).
United States District Court, E. D. Missouri, E. D.
May 31, 1977.
*861 *862 *863 Ralph W. Kalish, St. Louis, Mo., Local Counsel, Theodore L. Thomas and Clifford B. Price, Jr., Armstrong Cork Co., Lancaster, Pa., and David H. T. Kane and Siegrun D. Kane, Kane, Dalsimer, Kane, Sullivan & Kurucz, New York City, for plaintiff.
Philip B. Polster, Polster, Polster & Lucchesi, St. Louis, Mo., Carter H. Kokjer, Lowe, Kokjer, Kircher, Wharton & Bowman, Kansas City, Mo., for defendants.

FINDINGS OF FACT
WANGELIN, District Judge.
1. Plaintiff, Armstrong Cork Company, is a Pennsylvania corporation with its principal place of business in Pennsylvania.
2. Defendant Armstrong Plastic Covers Company (Armstrong Cover Kansas City) is a Missouri corporation having a place of business at 2714 East 12th Street, Kansas City, Missouri.
3. Defendant Armstrong Plastic Covers Co. II (Armstrong Cover St. Louis) is a Missouri corporation having a place of business at 3635 Forest Park, St. Louis, Missouri.
4. Defendant Armstrong Slip Covers Company (Armstrong Cover Atlanta) is a Missouri corporation organized and existing under the laws of the State of Missouri having a place of business at 728 Monroe Drive, N.E., Atlanta, Georgia.
5. Each of the corporate defendants is also known in its area as Armstrong Cover Co. and as Armstrong.
6. Defendant Joseph J. Salerno is President of Armstrong Cover St. Louis and is a resident of the State of Missouri residing at 440 Brass Lamp, Ballwin, Missouri.
7. Defendant James J. Salerno operates Armstrong Cover Kansas City and was a corporate officer of each corporate defendant and is now an officer only of Armstrong Cover Kansas City, and is a resident of the State of Missouri residing at 15011 East 40th Street, Independence, Missouri.
8. Named defendant Michael C. Salerno is an officer of and operates Armstrong Cover Atlanta and is a resident of the State of Georgia.
9. Defendant Frank Salerno is a former officer of Armstrong Cover Kansas City and is a resident of the State of Missouri.
10. For over half a century, plaintiff Armstrong has continuously used the trade name and mark Armstrong in connection with the manufacture and distribution of a broad range of home furnishing products and services which have been advertised and sold in interstate commerce. Plaintiff's mark Armstrong is a widely known, famous trademark.
11. The following products and services have been marketed under plaintiff's trade name and mark Armstrong:

a. Floor coverings (hard surface):
 Since 1917 National distribution and advertisement.
b. Carpeting (soft surface coverings):
 In the 1920's Sole Selling Agents for Fetterolf
 carpeting.
 Beginning in the National distribution and advertisement.
 mid-1950's
c. Wall coverings:
 Since the 1920's National distribution and advertisement.
d. Vinyl and plastic coverings for floors, walls and
 counter tops:
 Since the 1950's National distribution and advertisement.

*864
e. Ceilings, including tile and panel coverings and insulation
 material:
 Since the 1920's National distribution and advertisement.
f. Furniture and upholstery, including vinyl fabric:
 Beginning in the Distribution by plaintiff's
 late 1940's predecessor in various parts
 of the United States (over
 15 million dollars worth of
 sales), including continuous
 sales to Kansas City, St.
 Louis and Atlanta throughout
 the 1950's and 1960's.
 Since 1968 National distribution and advertisement.
g. Fabric by the piece suitable for slipcovers, drapes,
 etc.:
 Beginning in the Distribution by plaintiff's
 late 1940's predecessor in various parts
 of the United States, including
 continuous sales to Kansas
 City, St. Louis and Atlanta
 throughout the 1950's
 and 1960's.
 Since 1971 National distribution and advertisement.
h. Interior decorating and color coordination services:
 Since the 1920's Distribution of decorating
 booklets and advice in reponse
 to millions of consumer
 inquiries.
i. Home furnishings to builders:
 Since 1972 Complete home furnishings
 including draperies, bedspreads,
 pillows, etc. supplied
 to home builders.

12. Over the years Armstrong has expanded its product line and its rights to the name and mark Armstrong in the home furnishings area through a series of acquisitions including:
(a) Acquisition of the Deltox Carpet Co. in 1954. Deltox carpets by Armstrong were nationally sold and featured in TV and national magazines as one of the Armstrong products in the Armstrong room scenes during the 1950's and early 1960's.
(b) Acquisition of the E & B Carpet Company in 1967 followed by national sales and advertising of Armstrong's complete line of Armstrong carpeting for residential, business, mobile home and builder's use.
(c) Acquisition of the rights of plaintiff's predecessor, Armstrong Furniture Company, to the name and mark Armstrong. This usage of Armstrong to identify furniture and upholstery (including vinyls) as well as fabric by the piece suitable for slipcovers, drapery, etc., dates back to the mid 1940's. By the 1950's, Armstrong furniture and fabric was sold to well known department stores, interior designers, hotels and universities throughout the United States including the Kansas City, St. Louis and Atlanta areas. This business continued throughout the 1950's averaging annual sales in excess of half a million dollars and in the 1960's with yearly sales over a million and a quarter. In 1971, plaintiff Armstrong purchased all rights, title and interest to the name and mark Armstrong along with the good will symbolized by the mark and the right to sue for past infringement for a sum of $100,000.
(d) Acquisition of Thomasville Furniture in 1968 followed by national sales and advertising of a full line of Armstrong furniture for the contract and retail trade.
13. Plaintiff employs rigid quality control standards for its various products and services including testing new materials, meeting process specifications, inspection specifications, performance tests and follow up on customer complaints.
14. Two Hundred and Sixty Eight (268) Armstrong salaried employees are involved in quality control programs. Armstrong employees spend some 785,000 man hours per year on quality assurance activities.
15. Typical of plaintiff's quality control program are the standards required for carpet, implemented by plaintiff's quality assurance department. Armstrong carpet undergoes as many as 26 quality control inspections and up to 80 performance tests, including tests for resistance to stains, abrasion, crushing and fading.
16. As a result of plaintiff's quality control, the public is enabled to and does count on the consistent, reliable quality of all Armstrong products.
17. From 1950 to date, Armstrong has expended over 168 million dollars advertising Armstrong products and services to the consumer:

*865
Years Total Advertising
 In Excess of:
1950-59 39 million dollars
1960-64 46 million dollars
1965-69 46 million dollars
1970-74 37 million dollars

18. Since 1917, Armstrong has been advertising in national magazines including The Saturday Evening Post, Family Circle, Reader's Digest, Better Homes and Gardens, American Home, Good Housekeeping, Ladies Home Journal, Woman's Day, McCalls, Sports Illustrated and Time.
19. Circulation figures for the national magazines feature Armstrong advertising show exposure to tens of millions of consumers throughout the nation as well as exposure to hundreds of thousands of consumers in the local areas of Kansas City, St. Louis and Atlanta.
20. Armstrong radio advertising dates back to the late 1920's with the "Armstrong Quakers" (1928-1931). Since 1935, Armstrong began advertising on national network radio, including sponsorship of the Armstrong's Theatre of Today throughout the 1940's and early 1950's.
21. In 1950, Armstrong began advertising on national network television, including sponsorship of the Armstrong Circle Theatre throughout the 1950's and early 1960's. Armstrong products were also advertised on a number of popular TV game shows, soap operas, country music shows and comedies including: The Jimmy Dean Show (1957-1959); Top Dollar and House Party (1959); I Love Lucy, Edge of Night, Love of Life (1960); Danny Kaye (1963-1965); Password (1963-1966); Gidget and Big Valley (1965-1966).
22. Armstrong's national advertising has continuously been supplemented through the local advertising of thousands of retailers selling Armstrong products around the country, including the areas of Kansas City and St. Louis, Missouri, and Atlanta, Georgia. Armstrong retail advertising in local newspapers, radio and television and at the point of purchase has been part of these local scenes since well before defendants began using the mark Armstrong in each area.
23. Starting in the mid 1950's, Armstrong plastic and vinyl floor coverings, wall coverings and countertops have been widely advertised both in national and local campaigns. In 1959, plaintiff launched a major promotion for Armstrong vinyl coverings, highlighted by an eight page color spread in the August 1959 Saturday Evening Post and featuring ads in a wide variety of magazines with an exposure of some 16 million readers.
24. Television exposure for Armstrong interior furnishings was also substantial in the late 1950's. The Armstrong Circle Theatre was seen by approximately 20 million people each show, with advertising in excess of three million dollars for 1959 for this TV series alone.
25. By virtue of Armstrong's widespread promotion, advertising and sales, Armstrong interior furnishings including vinyl products were well and favorably known to the consuming public prior to the defendants' first sale of Armstrong vinyl covers in June 1960.
26. Throughout its history, Armstrong has displayed its products in room scenes designed by Armstrong interior decorators and these ads have consistently offered to consumers booklets and brochures with Armstrong interior decorating advice.
27. The Armstrong advertising has stimulated millions of inquiries from consumers with home furnishing problems and since the creation of Armstrong's Bureau of Interior Decoration nearly sixty years ago, the consumer has been receiving Armstrong booklets with decorating advice as well as specific suggestions from the staff of Armstrong decorators (including sample swatches) as to compatible wall and floor coverings and fabric for slip covers and draperies.
28. Armstrong publications in the decorating field include: Album of Room Ideas (1945); A Dream House for a Small Budget (1947); Decorator's Answer Book (1949); Go Ahead and Decorate (1951); Successful Decorating (1957); A Complete Guide to Modern Vinyl Floors (1959); as well as separately *866 published books: The Armstrong Book of Interior Decoration (1962) and Armstrong Decorating Ideas for the Active Rooms (1967).
29. Much of plaintiff's advertising and promotion for Armstrong products and services features the Armstrong mark without a circle around the "A" and without the full company name. Most consumers address plaintiff simply as "Armstrong".
30. Armstrong markets its products primarily through over 200 independent wholesalers who sell to approximately 75,000 retail accounts around the United States. The independent wholesalers have complete title to, dominion and control over the products purchased from plaintiff. Approximate sales of plaintiff's entire line of Armstrong interior furnishings beginning in 1940 exceed 7 billion dollars.
31. Average annual sales of Armstrong interior furnishing products are set forth below:

 Years Average Sales
 In Excess of:
 1940-1949 48 million dollars
 per year
 1950-1959 107 million dollars
 per year
 1960-1969 250 million dollars
 per year
 1970-1975 550 million dollars
 per year

32. Armstrong owns numerous registrations for the mark Armstrong in the United States Patent and Trademark Office including several as set out in an appendix to this Memorandum.
33. Armstrong Cover Kansas City began use of the trade name and mark Armstrong in connection with vinyl slipcovers in June, 1960. In approximately 1971, the Kansas City firm began to use the mark Armstrong in connection with plaintiff's carpeting. Some time in 1972, this firm began using the mark Armstrong for carpeting manufactured by others (non-Armstrong carpet).
34. The Kansas City firm subcontracted some drape sales in the early 1960's until 1965. After Jim Salerno's deposition in 1975, drape sales were again subcontracted leaving a 10 year gap without sales from 1965 to 1975. As to subcontracted sales, these are sold to the public under a private label, e.g., Jones Dept. Store, not under the name Armstrong. The Kansas City firm does business within a 30 mile radius of Kansas City.
35. Armstrong Cover St. Louis began using the trade name and mark Armstrong in connection with vinyl slipcovers in 1967. In 1970, this firm began to use the mark Armstrong in connection with plaintiff's carpeting as well as some non-Armstrong carpeting. In September, 1974, this firm began selling drapes. The St. Louis firm does business within a 50 mile radius of St. Louis.
36. Armstrong Cover Atlanta was organized in 1969 and some time thereafter began using the trade name and mark Armstrong in connection with vinyl slipcovers. In January, 1972, this firm began to use the mark Armstrong in connection with plaintiff's carpeting and during 1972 began selling non-Armstrong carpeting under the mark Armstrong. The Atlanta firm has never sold drapes. The Atlanta firm does business within a 40 mile radius of its Atlanta office.
37. Before defendants went into business they knew of plaintiff's Armstrong mark.
38. Plaintiff's mark Armstrong was heavily promoted for vinyl materials, e.g., floor coverings in tile and sheet form, counter tops, and wall coverings beginning in the mid 1950's, before defendant in Kansas City adopted Armstrong for vinyl covers in 1960.
39. Confusion between plaintiff and defendants occurred before defendants entered the carpet business in 1970 and defendants were well aware of this confusion. Thus, at the Kansas City store in the mid 1960's, James Salerno had occasion to mention to his brother Joe the consumer inquiries about a possible connection between defendants and plaintiff.
40. In 1968, after Joe Salerno opened the St. Louis branch, he instructed the very *867 first slipcover salesman he hired as to how to handle questions on the possible connection between Armstrong Cover and plaintiff. Defendants' salesmen were receiving at least one inquiry per month concerning an association with plaintiff before defendants took on carpets. Defendant Mike Salerno even went so far as to question his brother Joe's entry into the carpet business as causing possible confusion.
41. Defendants entered the carpet business over two years after plaintiff began national sales and advertising of its full line of home carpeting. In taking this step, defendants employed advertising and promotional techniques designed to further increase and capitalize on existing confusion.
42. Since approximately December, 1972, the Kansas City and St. Louis outlets have used a decal dominated by the mark Armstrong on binders containing carpet not originating with plaintiff (non-Armstrong carpet). The printing of the name Armstrong on said decal is identical to and was copied from the printing of plaintiff's corporate logo. Plaintiff's logo was specially designed and used for over twenty years.
43. At the time Kansas City and St. Louis began using said decal (at the end of 1972), their sale of non-Armstrong carpets increased by over 40%. From 1970 to 1973, defendants' carpet sales were comprised of the following percentage of non-Armstrong carpet:

 1970 1971 1972 1973
St. Louis 19.9% 0% 3.9% 47.1%
Kansas City 0% 1.2% 48%
Atlanta 0% 13% 37.3%

44. From March of 1974 through March of 1976, Armstrong Cover St. Louis has used a private label dominated by the mark Armstrong on various brands of non-Armstrong carpets. Defendant Joe Salerno's initial order for 200 private labels in March, 1974, was followed by an order for an additional 1,000 labels, delivered in June, 1974.
45. When the St. Louis company began using the private label, its sales of non-Armstrong carpet jumped from 47% to 79%.
46. Since 1974, defendants' total carpet sales comprise the following percentage of non-Armstrong carpet sales:

 1974 1975 1976
St. Louis 79.5% 90.8% 93.2%
Kansas City 72.1% 47.4% 40.8%
Atlanta 25.6% 43.4% 98.2%

47. At the time of designing the label and binder decals for their private label carpeting, defendants possessed specimens of plaintiff's carpet label and carpet binder logo. "Armstrong" takes up more space on defendants' binder decal and private label than any other single element.
48. Defendants furthered the confusing association between plaintiff and defendants' Armstrong by the following activities:
(a) the continuous repetitive reference to defendants as:
"Armstrong the most trusted name in floor covering in America"
and
"Armstrong the most trusted name in carpeting"
and
"Armstrong . . . a name folks have been depending on for quality and service for years"
and
"Armstrong the most famous name in floor covering today"
(b) The distribution of advertising and guarantees that refer to "Armstrong Carpet" but which defendants assert means carpet made by any source (non-Armstrong carpet).
(c) The distribution and intermingling of plaintiff's products and promotional material with defendants' products and promotional material, all of which are presented to the consumer as originating from the same source.
(d) Falsely assuring customers that defendants' products are backed by plaintiff's reputation.
(e) Describing defendants' non-Armstrong products as "Armstrong quality products" so the consumer believes all of defendants' products originate with plaintiff.
49. Defendants have admittedly offered to the public shag, sculptured and plush *868 carpets under the mark Armstrong at certain advertised prices when in fact defendants did not have any of said shag, sculptured or plush carpets available for sale at the advertised prices. Defendants' deceptive, misleading, false advertising under the name and mark Armstrong damages plaintiff's reputation.
50. Defendant, James Salerno, ordered the destruction of a videotape of one of defendants' TV commercials, after he found out that representatives of plaintiff had viewed a number of defendants' commercials at the Kansas City television station in December, 1974. Although plaintiff's representatives had viewed a number of different TV tapes, defendant singled out this specific commercial for destruction.
51. Plaintiff and defendants have the same ultimate customers: the average housewife with rugs, carpets and slipcovers in her home; she is not sophisticated in trademark law. Potential customers of defendants' products are also potential customers for plaintiff's products.
52. Typically the plaintiff's Armstrong carpets (and sometimes Armstrong vinyl floor covering) are displayed in the consumer's home side-by-side with defendants' private label Armstrong carpeting and slipcovers. Each party's products are advertised in the same media: radio, television and print.
53. Persons employed by each of the corporate defendants testified that customers had inquired on numerous occasions (as frequently as 3 and 4 times a week) as to the connection between plaintiff and defendants; that they have received calls at the offices of the corporate defendants which were intended for plaintiff; that the corporate defendants' customers thought that defendants' private label carpet and plaintiff's carpet had a common source of origin; that customers thought that the corporate defendants were plaintiff; that defendants' own employees were themselves confused as to the relationship between plaintiff and the corporate defendants and the sponsorship of the corporate defendants' advertising and labeling.
54. Defendants' own officers (the individual defendants in this case) have been confused by defendants' use of the mark Armstrong in advertising and cannot tell whether certain references to Armstrong in defendants' advertising refer to plaintiff or defendants. Defendants' own advertising agency personnel have also been confused by references to Armstrong in defendants' advertising material, and erroneously believed ads in fact sponsored by defendants were sponsored by plaintiff. Customers have been confused as to the sponsorship of defendants' advertising and the association between plaintiff and defendants. Better Business Bureau organizations in Kansas City and St. Louis have erroneously directed complaints about plaintiff's products to defendants.
55. Defendants are not normally identified by their full corporate names. Rather they have been identified by their officers, advertising agency personnel and in their advertising by the following names:
Armstrong
Armstrong Carpet
Armstrong Floor Covering
56. Plaintiff has been damaged by losing sales to defendants through defendants' use of the mark Armstrong. Each sale to a customer who believes he is purchasing plaintiff's carpet is one less sale for plaintiff.
57. Plaintiff's reputation is vulnerable to the acts of defendants in that confusion between plaintiff and defendants causes the acts and products of defendants to be mistakenly attributed to plaintiff. Specifically, defendants as well as the Better Business Bureaus in Kansas City, St. Louis and Atlanta have received numerous complaints as to the quality and workmanship of defendants' products and the services provided by defendants. These complaints as well as defendants' misleading advertising practices adversely reflect on plaintiff's reputation. Defendants' customers who have admittedly complained about being misled by defendants' advertising under the name and mark Armstrong will project their dissatisfaction to plaintiff, Armstrong.
*869 58. Plaintiff's first knowledge that defendant Joe Salerno was operating an outlet in St. Louis under the name "Armstrong Cover Company or Armstrong Slipcover" was in February, 1972.
59. On February 15, 1972, Clifford Price of plaintiff's Patent Department wrote to Joe Salerno warning that the use of "Armstrong alone in any of your advertising and business dealings . . . would probably lead others to believe that you are in some way associated with Armstrong Cork Company". When Mr. Price wrote the February 15, 1972 letter, he was not aware of defendants' use of Armstrong alone, or of defendants' TV, radio or magazine advertising, or that defendant was selling non-Armstrong carpet or of consumer confusion. Joe Salerno did not respond to the February 15, 1972 letter but rather allowed plaintiff to continue in its erroneous belief that Joe Salerno was not using Armstrong alone. The February 15, 1972 letter was meant as a warning and was received as a warning.
60. After receipt of the February 15, 1972 letter, Joe Salerno began displaying non-Armstrong carpet in binders dominated by the name Armstrong in type style copied from plaintiff's unique logo. After receipt of the February 15, 1972 letter, Joe Salerno adopted the private label dominated by the name Armstrong for use on non-Armstrong carpet. After receipt of the February 15, 1972 letter, Joe Salerno began supplying non-Armstrong carpet for advertisements of "Armstrong carpet" at special prices. After receipt of the February 15, 1972 letter, Joe Salerno began advertising his company as Armstrong, the most trusted name in floor covering in America. After receipt of the February 15, 1972 letter, Joe Salerno began using Armstrong Carpet interchangeably with Armstrong Cover Co.
61. Joe Salerno did not recall the existence of the February, 1972 letter during nearly two years of discovery proceedings. Neither Jim or Mike Salerno had any knowledge of the February, 1972 letter. The defendants did not change their conduct to their prejudice as a result of the letter.
62. Defendants' purchase of carpets from plaintiff's independent wholesale distributors and defendants' participation in wholesaler-sponsored activities, e. g., group tours of plaintiff's plant, training programs, cooperative advertising programs and phone book listings (all arranged by the independent wholesaler) do not impute knowledge of defendants' infringement to plaintiff. The policing of trademarks is not within the scope of duties of plaintiff's employees who process 5,000 to 8,000 cooperative advertising claims and 12,000 to 13,000 fund authorizations per year. The policing of trademarks is not within the scope of duties of plaintiff's district sales manager, whose principal job is selling plaintiff's carpet to 8 wholesalers and 2,000 retailers in a 12 state area.
63. During the alleged period of laches, plaintiff was vigorously policing its trademark, with two lawsuits and four controversies from 1971 through 1974, resulting in the termination of third party uses of Armstrong.
64. Armstrong's officers first became aware of defendants' activities under the Mark Armstrong when Mrs. Roger Robinson, one of defendants' Kansas City customers, wrote to plaintiff in August of 1974 reporting that Armstrong Cover Company of Kansas City "is falsely representing itself as being a subsidiary of your company" and that Mrs. Robinson was "assured by [defendants' salesman" that the slipcovers she purchased "were to be made of Armstrong fabric and backed by your Company's reputation".
65. After investigating defendants' activities, plaintiff advised defendants that their use of Armstrong infringed plaintiff's name and mark Armstrong in December, 1974. Despite that notice, defendants have continued to advertise and sell their products and continued their private label use under the name and mark Armstrong.

Conclusions of Law
This Court has jurisdiction over the parties and subject matter of this action. 15 *870 U.S.C. § 1121; 28 U.S.C. § 1338. Venue is proper under 28 U.S.C. §§ 1391 and 1392.

1. Theories of Liability.
The United States Patent and Trademark Office has adjudged the mark Armstrong to be distinctive as to the goods recited in plaintiff's trademark registrations. Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp., 350 F.Supp. 1341, 1358 (E.D. Pa.1972). The trademark Armstrong and Federal Registration Numbers, 519,429; 523,396; 903,933; 974,785; 988,391; and 999,041 for said mark are valid, subsisting, uncancelled, unrevoked and owned by plaintiff. 15 U.S.C. § 1057(b).
A trademark registered by the United States Patent and Trademark Office is presumed distinctive and valid. Registration creates the presumption that the trademark owner has the exclusive right to use the mark and that the statutory prerequisites to valid registration have been met, i. e., that (1) the mark is dissimilar to other registered marks for similar goods; (2) has acquired secondary meaning; (3) is owned by the registrant; and (4) that the registrant has the exclusive right to use the trademark in commerce in connection with the goods specified. 15 U.S.C. § 1057(b). Iowa Farmers Union v. Farmers' Educational and Cooperative Union, 247 F.2d 809, 817 (8th Cir. 1957).
Armstrong does not have to prove secondary meaning as to the mark Armstrong in connection with goods specified in its federal registrations. Curtis-Stephens-Embry Co. v. Pro-Tek-Toe Skate Stop Co., 199 F.2d 407, 413 (8th Cir. 1952). As to those registrations for Armstrong which have become incontestable, Reg. Nos. 519,429 and 523,396, defendants are foreclosed from raising any defense not enumerated in § 33(b) of the Lanham Act, 15 U.S.C. § 1115(b).
Trademark rights develop through use. Plaintiff has demonstrated its rights in the mark Armstrong in the home furnishings field through long, continuous use, extensive advertising, and public acceptance of the mark. Sweetarts v. Sunline, Inc., 380 F.2d 923, 926 (8th Cir. 1967). When these factors combine to cause an association by consumers of a mark with certain goods, distinguishing them from other goods, the mark has acquired a secondary meaning. That secondary meaning is entitled to protection by the courts. Truck Equipment Service Company v. Fruehauf Corporation, 536 F.2d 1210, 1219 (8th Cir. 1976). By virtue of millions of dollars of advertising, and billions of dollars of sales of Armstrong home furnishings, Armstrong is a famous mark entitled to a broad scope of protection.
Plaintiff is the prior user of the mark Armstrong in the home furnishings field. The exclusive right to use the mark belongs to the first who appropriates it and uses it in connection with a particular business. Plaintiff and its predecessor used the mark Armstrong in connection with floor coverings, wall coverings, ceilings, carpets, furniture and fabrics for draperies, slipcovers and upholstery long prior to defendants' first use. Any doubts as to confusion are to be decided against the newcomer. E. I. duPont de Nemours & Company v. Yoshida International, Inc., 393 F.Supp. 502, 510 (E.D.N.Y.1975).
Plaintiff is entitled to rely on its predecessor's long use of the mark Armstrong in connection with fabric and furniture. An assignment of a trademark is valid so long as the assignee continues use of the assignor's trademark on products of substantially similar characteristics. Pepsico, Inc. v. Grapette Company, 416 F.2d 285, 288 (8th Cir. 1969). As long as the trademark is assigned along with the good will which it symbolizes, the trademark assignment is effective even though there is no transfer of tangible assets. Glamorene Products Corporation v. Procter & Gamble Company, 538 F.2d 894 (Cust. & Pat.App. 1976).
Where defendants have chosen the same mark for similar products, they bear the burden to explain fully why such term was chosen. Kiki Undies Corp. v. Promenade *871 Hosiery Mills, Inc., 411 F.2d 1097, 1101 (2d Cir. 1969). No one connected with defendants bears the surname Armstrong. Defendants have offered no credible reason for their choice of the name Armstrong for use on vinyl slipcovers and carpets.
Defendants had actual knowledge of plaintiff's use of Armstrong. Their adoption of the mark was not innocent. W. E. Bassett Company v. Revlon, Inc., 435 F.2d 656, 662 (2d Cir. 1970). Also, prior to adopting the mark Armstrong, defendants had constructive notice of plaintiff's rights to the mark through plaintiff's trademark registrations. 15 U.S.C. § 1072.
The test for trademark infringement is whether defendants' use "is likely to cause confusion, or to cause mistake, or to deceive". 15 U.S.C. § 1114(1). Sweetarts v. Sunline, Inc., 380 F.2d 923, 927 (8th Cir. 1967). Likelihood of confusion, not actual confusion, is the test. However, since actual confusion is difficult to uncover in trademark cases, any evidence of actual confusion is strong evidence of likelihood of confusion.
The test for likelihood of confusion is the general over-all impression created in the mind of the consumer who may have an imperfect recall of the plaintiff's trade name or mark. Union Carbide Corporation v. Ever-Ready Incorporated, 531 F.2d 366, 188 U.S.P.Q. 623, 638 (7th Cir. 1976). Factors to be considered include:
(1) the degree of similarity between the designation and the trademark or trade name;
(2) the relation in use and manner of the marketing between the goods or services marketed by the actor and those marketed by the other;
(3) the degree of care likely to be exercised by purchasers;
(4) the intent of the actor; and
(5) the existence of actual confusion.
Apply these facts to this case and there is no question that an infringement occurred. First, defendants' mark Armstrong is identical in sound appearance and meaning to plaintiff's mark. Plaintiff's rights in the mark Armstrong are not limited to the exact style shown in its advertisements or registrations.
Second, the goods marketed by defendants, slipcovers, carpets, and draperies, are identical or closely related to products sold by plaintiff. See Sweetarts v. Sunline, Inc., supra. All of the goods in question are within the area of home furnishing making marketing techniques similar. This also means that the same class of ultimate consumer will be customers of both plaintiff and defendants.
The degree of care exercised by consumers and the existence of actual confusion coincide to a certain extent. The evidence clearly showed that many consumers did not look beyond the mark Armstrong to a full corporate name thus creating much actual confusion.
Finally, the intent of defendants to infringe was clearly shown. Defendants were aware of plaintiff's prior use of the mark Armstrong and had no particular reason to adopt it. Their use of such slogans as "Armstrong, the most famous name in floor covering in America" compels the conclusion that they were attempting to profit from plaintiff's reputation and advertising.[1]
Defendants' use of the mark Armstrong in advertising and in the direct solicitation of sales in connection with products other than those of plaintiff is unlawful under the principles of unfair competition. Heaton Distributing Co. v. Union Tank Car Company, 387 F.2d 477, 483 (8th Cir. 1967). Full and fair competition requires that those who invest time, money and energy in the development of good will and a favorable reputation be allowed to reap the advantages of their investment. Assuming defendants' products were of equal quality, their actions constituted a false designation of origin. Truck Equipment Service Company v. Fruehauf Corporation, *872 536 F.2d 1210 (8th Cir. 1976). Thus defendants must assume liability for actions which were reasonably calculated to deceive consumers.

2. Alleged Defenses.
Defendants claim that any infringement on their part was innocent, that plaintiff is guilty of laches, and that plaintiff's mark was registered fraudulently. None of these defenses have merit.[2] Before defendants adopted the mark Armstrong for vinyl slipcovers, they received constructive notice of plaintiff's claim to the mark Armstrong for floor covering, wall covering, ceiling material and other goods in the home furnishings field recited in Armstrong's Registration Numbers 519,429 and 523,396. The constructive notice effect of § 22 of the Lanham Act, 15 U.S.C. § 1072, means that use of a name or mark which is the same as or confusingly similar to plaintiff's mark Armstrong cannot be justified by a claim of innocence, good faith or lack of knowledge. Also defendants admit actual knowledge of plaintiff's mark prior to their adoption of Armstrong.
To invoke the doctrine of laches defendants have the heavy burden of showing prejudice because of delay as well as the inexcusable character of delay. Layton Pure Food Co. v. Church & Dwight Co., 182 F. 24, 32-33 (8th Cir. 1910). Mere passage of time is not sufficient to constitute laches. Defendants must show that they relied upon plaintiff's knowledge or notice of their infringing activities and so changed their position that it would now be inequitable for a court to enforce plaintiff's rights in its trademark. Layton Pure Food Co., supra. The facts of the case show neither.
Plaintiff's delay of two years and ten months before requesting the defendants to cease their infringing activities is not an unreasonable or inexcusable amount of time. Electronic Communications, Inc. v. Electronic Components for Industry Co., 443 F.2d 487 (8th Cir. 1971). Plaintiff has been actively engaged in pursuing other infringers during the period of the delay.
A defendant relying on a § 33(b) defense or defect under the Lanham Act must plead it affirmatively and must sustain the burden of establishing such defect in order to overcome the presumption of validity which attaches to a federally registered mark. Iowa Farmers Union v. Farmers' Educational and Cooperative Union, supra. Defendants have not met this burden.

3. Defendants' Counterclaims.
In order to prevail on its counterclaim for the cancellation of the plaintiff's trademark registrations because of their fraudulent procurement, the defendants must show that the plaintiff knew that the defendants possessed a superior right to use the same or substantially identical mark for the same or substantially identical goods or services as those in connection with which registration was sought. SCOA Industries, Inc. v. Kennedy & Cohen, 188 U.S.P.Q. 411, 414 (T.T.A.B.1975).
To prevail upon its counterclaim for antitrust violations arising from the enforcement of plaintiff's trademark rights, the defendants must prove all the elements of an antitrust cause of action. Coca-Cola v. Howard-Johnson Co., 386 F.Supp. 330, 184 U.S.P.Q. 549 (N.D.Ga.1974). Defendants have totally failed to make either showing. The good faith enforcement by the plaintiff of its trademark rights does not constitute an antitrust violation or a trademark misuse. Alberto-Culver Co. v. Andrea Dumon, Inc., 466 F.2d 705, 711 (7th Cir. 1972).

4. Plaintiff's Remedies.
Plaintiff is entitled to an absolute injunction prohibiting all use of Armstrong by defendants under 15 U.S.C. § 1116. Heaton Distributing Co. v. Union Tank Car Company, 387 F.2d 477, 486 (8th Cir. 1967). *873 The present public impression of confusion created by defendants' extensive fraud and deceit cannot be undone without an absolute injunction. Since defendants' past conduct and business practices have produced confusion, which if permitted to continue, will irreparably diminish plaintiff's good will, the Court is justified in granting relief much broader than it might have, had the infringement been innocent. Kentucky Fried Chicken Corp. v. Diversified Packaging Corp., 549 F.2d 368, 390 (5th Cir. 1977).
There is ample support in the record for a monetary award to compensate plaintiff for damage to its reputation. Under the circumstances it would be impractical to require an accounting of profits generated by defendants' infringement. Thus, judgment will be entered for plaintiff enjoining defendants from further violating plaintiff's rights and awarding damages, costs and attorney's fees.[3]
NOTES
[1] The individual defendants had various explanations for evidence that indicated an intent to infringe. However, the Court did not find them credible witnesses.
[2] To the extent that defendants have raised other defenses the Court considers them to be without support in either fact or law.
[3] This is clearly an exceptional case within the meaning of 15 U.S.C. § 1117 making an award of attorney's fees proper.