**HEALTH INDUSTRIES, INC., a Utah Corporation, Plaintiff,**

v.

**EUROPEAN HEALTH SPAS, a South Dakota Corporation, and James R. French, Defendants.**

Civ. No. 79–4032.

United States District Court, D. South Dakota, S. D.

May 12, 1980.

---

Deming Smith of Davenport, Evans, Hurwitz & Smith, Sioux Falls, S. D., and Frederick B. Ziesenheim and Paul A. Beck of Blenko, Buell, Ziesenheim & Beck, Pittsburgh, Pa., for plaintiff.

John N. Gridley, III, Sioux Falls, S. D., for defendants.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

This action is based on an alleged infringement of a service mark held by plaintiff. Plaintiff, Health Industries, Inc., is a Utah corporation with its principal office in Baltimore, Maryland. It owns and operates health clubs throughout the United States under the name "European Health Spas." Defendant European Health Spas, Inc., is a South Dakota corporation. It operates one health club in Sioux Falls, South Dakota, under the name of "European Health Spa." Its president and sole stockholder is the other defendant, James French.

### Factual Background

In 1968 plaintiff purchased Palm Springs and European Health Spa of Portland, Oregon. The purchased company had been using the term "European" in connection with health club services since 1965. Following the purchase, plaintiff adopted the term "European" for all of its existing spas and has continued to use the mark.

Application was made for registration of the service mark EUROPEAN for health club services on June 17, 1971. The Patent and Trademark Office granted registration on July 18, 1972, for a term of twenty years. Plaintiff duly filed a "Five Year Affidavit" pursuant to 15 U.S.C. sections 1058 and 1065.

Plaintiff has 142 health spas, operating in 27 states, under the name European. None of plaintiff's spas are in South Dakota; the two closest cities with plaintiff's spas are Minneapolis, Minnesota, and Omaha, Nebraska. Due to the nature of its present record-keeping system, plaintiff is unable to say exactly how many customers, or members, it has at any given moment. The informed estimate presented at trial was around 600,000 members, with an additional 200,000 members in a Southern California affiliate operating under the name of Jack LaLanne's European Health Spas. Plaintiff owns fifty per cent of this affiliate, controls it through the Board of Directors, and consolidates its earnings report with plaintiff's earnings report.

Customers are sold memberships for a specified period of time. A membership card is issued that entitles a member to use any one of plaintiff's 142 facilities. Although the facilities differ somewhat, they generally consist of a reception area and what was characterized at trial as a wet area and a dry area. A swimming pool, sauna, steam room, inhalation room, whirlpool, showers and toilets are located in the wet area. The dry area consists of locker rooms, dressing rooms, sunray booths, and an exercise and conditioning area. Upon joining, each member is given a personal, supervised program to follow.

Both plaintiff and defendant agree that the segment of the health industry in which they operate is heavily dependent upon aggressive selling. Between 1974 and 1979 plaintiff expended over 20 million dollars on various forms of advertising. Plaintiff has advertised on a number of local television stations. Among those stations on which plaintiff regularly advertises are stations from Minneapolis, Denver, and Atlanta; all stations that are from time to time viewable in Sioux Falls by virtue of the Sioux Falls Cable Television Company. A broad range of national magazines have also been utilized by plaintiff in its promotional campaigns. Among the many newspapers in which plaintiff's ads have appeared is the Minneapolis Tribune, a publication that enjoys substantial circulation within the Sioux Falls area.

Signs outside many of plaintiff's spas, as well as most of its older advertising, bear a unique rendering of the words "European Health Spa." This rendering was referred to as a logotype, or "logo." In recent years a distinctive, staggered typeface, styled "Grouch", has been used in the ads. In 1979, plaintiff began using a sketch of an adult male-female couple, sitting back to back with their knees raised. Catchy slogans—the most memorable is probably "I Want Your Body"—were utilized in most of the ads.

A large number of printed ads, as well as video "spot" ads, were introduced at trial. Different themes were utilized, but it was obvious throughout that plaintiff was trying to create an image far removed from the grimy gyms portrayed in "B" grade boxing movies or that portion of the educational process known as "P.E." or "gym class." The models, both male and female, were extremely attractive and bore an aura of sophistication and intelligence. Nobody was sweating. Some of the materials portrayed actual locations in plaintiff's spas. The decor and architecture in many instances created a Mediterranean milieu of the neo-classical Greco-Roman variety. The overall impression was that the journey to a new and healthier you was going to be a chic and enjoyable experience.

Defendant French began working in the health industry in 1967. He has continued to work in the field, except for a hiatus occasioned by military service, since that time. Prior to 1976 French's endeavors in the trade had been limited to the capacity of employee. Determined to open a health club of his own, he began a search for a suitable city. Through research he narrowed his options to Sioux Falls, South Dakota, and Fargo, North Dakota. He journeyed from Indiana to the Dakotas, and, after visiting both cities, decided Sioux Falls was the more likely spot for his venture.

Defendant European Health Spas opened its facility in Sioux Falls on March 21, 1977. Shortly thereafter defendant joined an organization known as the International Physical Fitness Association (IPFA). IPFA is an organization of independent health clubs, located in the United States and various foreign countries, that honor one another's memberships. On the strength of this membership defendant has included in its advertisements the words "Coast to Coast—Worldwide."

At the time French adopted the name "European Health Spa," he was aware of plaintiff's use of the name. French had an outdoor sign made with the words "European Health Spa" rendered in a manner indistinguishable from the logo then being utilized by plaintiff. Defendant subscribed to a "clipping service;" a company that sends customers copies of ads relating to a certain product or service that have appeared in newspapers throughout the country. Defendant uses the clipping service for ideas for its own advertising campaigns. Plaintiff's ads have obviously proven to be fertile ground for "ideas." The logo in "Grouch" typeface has been utilized by defendant. The back-to-back seated figures have also appeared. And, several advertising themes first seen in plaintiff's ads—including the deathless "I Want Your Body"—have been parroted by defendant.

French admitted that two or three members of plaintiff's club attempt to use defendant's facilities every month. Plaintiff produced three individuals who had been misled. Two of the witnesses had purchased memberships in plaintiff's club while living in the Minneapolis area. Both had been apprised of the fact that their memberships were valid in any one of the plaintiff's nationwide chain of spas. One received a telephone solicitation from defendant. Upon informing the caller that she was a lifetime member of "European Health Spas," she was advised that her membership was not valid in Sioux Falls. She had seen defendant's sign in Sioux Falls and assumed, on the basis of its similarity with plaintiff's logo, that defendant's facility was part of plaintiff's organization.

The other member of plaintiff's club saw defendant's ads in the Sioux Falls newspaper. She made arrangements to travel from her home in Flandreau, South Dakota, some thirty miles from Sioux Falls, to use defendant's facility. On arriving at the spa she presented her membership card. She too was informed that her membership was not valid at the Sioux Falls spa. Both voiced resentment at their having been "duped."

The third witness joined defendant's spa while a resident of Sioux Falls. She had seen plaintiff's spas in the Twin Cities area. She had been considering moving to the Twin Cities, and joined defendant's spa thinking that she could transfer her membership. She was told by defendant's agents that she would have no problem using spas after she moved. After moving she attempted to use one of plaintiff's spas. Her sentiments upon learning that the card issued by defendant did not entitle her to use plaintiff's spa parallelled those of the other two witnesses.

French testified that he had arrived at a reciprocity agreement with a Ron Garabed. Garabed was plaintiff's area manager for the Minneapolis area from June 7, 1978, through May, 1979. The substance of this alleged agreement was that French would honor plaintiff's memberships and Garabed would honor defendant's memberships. This agreement was supposedly made telephonically in the early part of June, 1978.

An employee of defendant's corroborated the fact that an individual identifying himself as Garabed had placed a call to French. Garabed, on the other hand, denies ever having talked to French. In fact Garabed claims he first became aware of defendant's operation in April of 1979, while attending a seminar in Florida.

Plaintiff quite simply contends that it has a valid, registered service mark and that it is entitled to injunctive and monetary relief. Defendants counter with the defense that the word "European" is geographic and generic. They further contend that it has acquired no secondary meaning. As a second line of defense they claim that plaintiff's relationship with Jack LaLanne's European Health Spas prevents it from claiming exclusive rights to use the mark. Finally, they advance an estoppel theory based on the purported agreement with Garabed. In the event the court finds plaintiff is entitled to injunctive relief, defendants urge that no money award be made.

## II. ENFORCEABILITY OF PLAINTIFF'S SERVICE MARK

■ Plaintiff bases its claim for relief upon the Lanham Act, 60 Stat. 427, 15 U.S.C. section 1051 et seq. The Act provides protection against the use of marks that are likely to cause confusion, to cause mistake or to deceive. A service mark is a "mark" used in the sale or advertising of services to identify the services of one person and distinguish them from the services of others. Service marks are registrable and entitled to protection in the same manner as are trademarks. 15 U.S.C. section 1501. Federal registration does not create a protectable mark. Rather, a mark is a property right, based on common law, that is acquired through use. *E. g. Tillamook County Creamery Ass'n. v. Tillamook Cheese and Dairy Ass'n.*, 345 F.2d 158 (9th

Cir. 1965), *cert. den.* 382 U.S. 903, 86 S.Ct. 239, 15 L.Ed.2d 157 (1965).

Federal registration does, however, provide certain procedural and substantive rights not always available at common law. Registration is prima facie evidence of the plaintiff's exclusive right to use the mark in commerce, *Wrist-Rocket Mfg. Co. v. Saunders*, 515 F.2d 846 (8th Cir. 1974), *cert. den.* 423 U.S. 870, 96 S.Ct. 134, 46 L.Ed.2d 100 (1975), and the defendant must affirmatively plead and sustain the burden of establishing a statutory defense or defect. *Iowa Farmer Union v. Farmers' Education and Cooperative Union*, 247 F.2d 809 (8th Cir. 1957); and, *Armstrong Cork Co. v. Armstrong Plastic Covers Co.*, 434 F.Supp. 860 (D.C.Mo.1977).[1] The most important of the substantive rights is that constructive notice under 15 U.S.C. section 1072 provides a registrant nationwide protection for its registered mark. *See, Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co.*, 477 F.2d 150 (6th Cir. 1973).

### A. Likelihood of Confusion

■ The touchstone of trademark infringement is the "likelihood of confusion." *Sweetarts v. Sunline, Inc.*, 380 F.2d 923, 927 (8th Cir. 1967). It is generally said that the relevant inquiry is whether an "ordinarily prudent purchaser" would be likely to be misled or confused as to the source of the goods or services in question. *David Sherman Corp. v. Heublein, Inc.*, 340 F.2d 377 (8th Cir. 1965). Among the factors to be considered are the similarity in appearance, sound and meaning of the names, and the nature of the goods or services. *See, New West Corp. v. NYM Co. of Cal. Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979). Actual confusion, while not required, is also strong evidence of the likelihood of confusion. *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976), *cert. den.* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976);

1. There is a split in the Circuits over the effect of a mark becoming "incontestable" under 15 U.S.C. sections 1065 and 1115. The Eighth Circuit has held that incontestability is a shield rather than a sword, and only frees a registrant from defending its use of a mark. *Wrist-Rocket, supra*, 516 F.2d 851. This defensive/offensive analysis was rejected by the Seventh Circuit in *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976), *cert. den.* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). Although the Seventh Circuit advances appealing arguments in support of its position, this court feels constrained by the *Wrist-Rocket* decision.

*AMP, Inc. v. Foy*, 540 F.2d 1181 (4th Cir. 1976). And although evidence of intent is certainly not essential, where evidence shows that a defendant deliberately adopted another's name with view to obtain some advantage from good will, good name and good trade which the other has built up, then an inference of likelihood of confusion is readily drawn. E. g., *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149 (9th Cir. 1963), *cert. den.* 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963).

■ Defendant's use of "EUROPEAN" simply could not be more similar to plaintiff's. Both are engaged in providing the same service to the public. The name is identical. Defendant has twice appropriated logos used by plaintiff. Although defendant has not been reluctant to appropriate ads from many sources, an especial affinity for plaintiff's ad campaigns is apparent. Additionally, defendant's "nationwide" claim based on its IPFA membership, albeit basically legitimate, contributes to the impression that defendant is connected with plaintiff's organization.

The evidence as to actual confusion certainly indicates that there is a likelihood of confusion inherent in defendant's use of the mark.

The intent of defendant to benefit from plaintiff's efforts to establish its mark is easily inferred from the evidence. Defendant was well acquainted with the health club industry and knew of plaintiff's prior use of the mark. See, *Armstrong Cork Co. v. Armstrong Plastic Covers Co.*, supra, 434 F.Supp. at 871. Furthermore, the reasons French advanced at trial for his choice of the name "European," can at best be characterized as thin. See, *Tiffany & Co. v. National Gypsum Co.*, 459 F.2d 527 (C.C.P. A.1972). When added to the pirating of ad formats and logos, the above factors support the inference that there was an intent on the part of defendants to bask in the reputation created by plaintiff.

Viewing the overall circumstances, it is apparent that only the most discerning, perhaps picayunish is more appropriate, member of the public would not be confused by defendant's use of the mark.

**B. "European" as a Generic or Geographic Term**

Against the strong evidence that defendant's use of "European" is likely to cause confusion, the defendant first raises the contention that the word is geographic and generic in nature, and is therefore not protectable. See, 15 U.S.C. section 1115(b)(4). The court is not persuaded.

■ A term that designates a place may not be the subject of an enforceable mark if it: 1) is primarily geographically descriptive of the origin of the goods or services, or, 2) has become so associated with a product or service that it cannot function as a means of distinguishing an individual seller. Under the Lanham Act a geographical term is not registrable if it is *primarily* geographically descriptive of the regional origin of the goods or services. 15 U.S.C. section 1052. Where the geographical term is used in an arbitrary manner it is not primarily geographically descriptive. See, *LaTouraine Coffee Co. v. Lorraine Coffee Co.*, 157 F.2d 115 (2nd Cir. 1946), *cert. den.* 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663 (1946).

■ A geographic term may also become so associated with a product or service that it becomes descriptive, or "generic," when applied to that product or service. See, McCarthy, Trademarks and Unfair Competition, section 14.8 (1973). Instances include: FRENCH fried potatoes, DANISH pastry, and SWISS cheese. *Id.* But, a mark that is "suggestive," as opposed to descriptive, and requires the observer to use imagination and perception to determine the nature of the service, is not classified as generic. See, *Telemed Corp. v. Tel-Med Inc.*, 588 F.2d 213, 217 (7th Cir. 1978).

■ The word "European" is quite probably generic when used to describe cuisine, hotel accommodation plans, or the styling of a suit after one has informed a salesman of an odd fit. The term "European" is not so readily associated with health club services. Remembering that defend-

ant has the burden of proving defenses against a registered mark, defendants in this case have done little more than raise a bald conclusion. No evidence was adduced that in the trade the "European" denominates a certain type of health club service. Defendant had access, through its clipping service, to advertisements from clubs throughout the country. Some of these ads were introduced by defendant. None referred to their services as being "European."

The term is being used by plaintiff primarily to convey romantic overtones, rather than primarily describe where the services originate. The term is therefore being used in an arbitrary fashion; not as a "geographic" term. The use can similarly be viewed as suggestive instead of descriptive/generic.

Under these circumstances no finding of secondary meaning is necessary. *See,* McCarthy, *supra* at section 14.3. In passing it is noted that plaintiff's registration provided prima facie evidence of secondary meaning. *Id.* There was no evidence produced to the contrary. In addition, the extensive advertising and the amount of sales shown by plaintiff are at least circumstantial evidence that the term has acquired secondary meaning. Even if defendant's contention as to the generic and geographic nature of the term "European" was correct, plaintiff would prevail.

### C. Plaintiff's Relationship With "Jack LaLanne European Health Spas."

Defendant's second line of defense centers on the use of the term "European" by the Jack LaLanne organization. Defendant claims this use has the effect of misrepresenting the source of services. *See,* 15 U.S.C. § 1115(b)(3). This contention is without merit.

A registered mark may be used by companies related to a registrant so long as the mark is not used in such manner as to deceive the public. 15 U.S.C. section 1055. A "related company" is defined as "any person who legitimately controls or is controlled by the registrant in respect to the nature and quality of the . . . serv-

ices in connection with which the mark is used." 15 U.S.C. section 1127. Plaintiff owns 50% of Jack LaLanne and retains control through the board of directors. Quality control is further assured through regular audits conducted by plaintiff's representatives. There is no indication from the record that this arrangement has been used to deceive the public.

### D. Estoppel

Defendant finally contends that an alleged reciprocity agreement with one of plaintiff's employees is sufficient to estop plaintiff from contending that defendant is infringing. Even if the reciprocity agreement was consummated, it is doubtful that plaintiff would be prevented from seeking at least injunctive relief. The agreement allegedly occurred a considerable time after defendant started using the mark. The defendant did not in any way change its position in reliance on the alleged agreement. Assuming its validity, the agreement was not so sweeping as to impliedly assure the defendants that there were no objections to their use of the mark. Moreover, defendant was contacted roughly two months after the date of the alleged agreement by plaintiff's counsel. French was informed that his use of the mark was considered an infringement. It was months and several contacts later that plaintiff's counsel was first apprised of the alleged reciprocity agreement. There is no written memorandum concerning this agreement, which seems unusual given the surrounding circumstances. Also, Garabed denies any knowledge of such an agreement. As the trier of fact this court must weigh the credibility of witnesses presenting conflicting testimony. It is found that more likely than not there never was a reciprocity agreement.

### III. REMEDIES

The remedial provisions of the Lanham Act were revised in 1975. 88 Stat. 1949 (1975). The several courts vested with jurisdiction under the Lanham Act have, *inter alia,* the power to grant injunctions, make monetary awards, and order the destruction

of infringing articles. The facts as developed in this case justify the exercise of each of these powers.

The court has the power to issue an injunction with such terms it deems reasonable to prevent the violation of any right of the registrant. 15 U.S.C. section 1116. In approaching this aspect of relief the court is particularly mindful of the public protection function of trademark law. *See, Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326 (3rd Cir. 1973), *cert. den.* 414 U.S. 858, 94 S.Ct. 66, 38 L.Ed.2d 108. A permanent injunction is the only way to prevent the likelihood that the public will be misled. The defendants should be enjoined from any future use of the term "European" in conjunction with health club services. A period of sixty days following issuance of the injunction is sufficient to allow a "change-over" ad campaign. In that period of time defendant may use the term "European" only to identify its previous business name.

Under the 1975 amendments the plaintiff is entitled to recover:

1) defendant's profits,

2) any damages sustained by the plaintiff, and

3) the costs of the action.

15 U.S.C. section 1117. There is no requirement in the statute that there be direct competition between the parties before profits are awarded. In *Amana Society v. Gemeinde Brau, Inc.*, 557 F.2d 638 (8th Cir. 1977), an award of profits was approved even though the products of the parties were different, and therefore not competing. The plaintiff is only required to prove defendant's sales; the defendant must prove any costs or deductions. 15 U.S.C. section 1117. Defendants had an accountant testify, on the basis of an unaudited material, as to defendant's profits. More accurately, the accountant testified to a lack of profits. His testimony was based on the assumption that defendants would not sell another membership in future years. This assumption was far-fetched and contrary to the manner in which the health club industry operates. This skewed testimony almost justifies ignoring defendants' offered testimony of costs and deductions entirely.

Plaintiff is seeking profits from the time defendant was first notified, on August 22, 1978, of plaintiff's position on the infringement. French and his wife received $36,000 as salary during 1978. He had the use of a leased Cadillac and was given a loan by the corporation for the purpose of making a down-payment on a home. The court feels that the difference between what he actually received and what he would have received as a mere employee is approximately $10,000 from August 22, 1978, to the present. This is a rough measurement and its major justification as an award probably lies in the court's feeling that under the circumstances an award of the entire amount of sales is excessive. 15 U.S.C. section 1117.

Attorney's fees may be awarded in exceptional cases. 15 U.S.C. section 1117. This is not an exceptional case. No claim has been made by plaintiff that any damages were sustained. Costs should be paid by the defendants, however.

Finally, any printed material in the possession or control of the defendants that uses the term "European" to designate the health club operation in Sioux Falls, should be turned over to the plaintiff for destruction. 15 U.S.C. section 1118; *see, Amana Soc. v. Gemeinde Brau, Inc.*, 557 F.2d 638 (8th Cir. 1977).

## IV. CONCLUSION

The plaintiff has established an infringement of its exclusive right to use the term "European" in connection with health club services. Defendant has presented no valid defenses. The circumstances surrounding the infringement justify the issuance of a permanent injunction and the awarding of profits. Costs should also be paid by defendants. All printed material used to promote defendant's spa bearing the term "European" should be turned over to plaintiff for destruction. Each party should be responsible for their own attorney's fees.

The foregoing is intended to operate as the court's findings of fact and conclusions of law.