577 F.Supp. 668 (1983)
EMERSON ELECTRIC COMPANY, Plaintiff,
v.
EMERSON QUIET KOOL CORPORATION, National Union Electric Corporation and Brightman Distributing Co., Inc., Defendants.
No. 83-1070C(1).
United States District Court, E.D. Missouri, E.D.
December 29, 1983.
*669 *670 Veryl L. Riddle, Michael B. Mckinnis, St. Louis, Mo., Henry J. Zafian, Herbert F. Schwartz, Vincent N. Palladino, New York City, for plaintiff.
John D. Pope III, St. Louis, Mo., for defendants.

MEMORANDUM
NANGLE, Chief Judge.
Plaintiff Emerson Electric Company brought this action against Emerson Quiet Kool Corporation, National Union Electric Corporation and Brightman Distributing Co., Inc., for infringement of federal trademark and trade name rights, unfair competition and violation of the Missouri anti-dilution statute. Plaintiff is seeking a permanent injunction, restraining defendants' use and registration of the mark "EMERSON QUIET HEAT" in connection with the marketing of defendants' space heating products.
This case was tried to the court sitting without a jury. The court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52. Fed.R.Civ.P. 52.

I. FINDINGS OF FACT:
1. Plaintiff Emerson Electric Co. (hereinafter "Emerson") is a Missouri corporation, having its principal place of business at 8000 West Florissant, St. Louis, Missouri.
2. Defendant Emerson Quiet Kool Corporation (hereinafter "Emerson Quiet Kool") is a Delaware corporation and a wholly owned subsidiary of National Union Electric Corporation, having a place of business at 10746 Indian Head Industrial Park, St. Louis, Missouri.
3. Defendant National Union Electric Corporation (hereinafter "National Union") is a Delaware corporation having a place of business at 9750 Reavis Park Drive, St. Louis, Missouri, and is a successor of the Emerson Radio & Phonograph Corporation.
4. Defendant Brightman Distributing Co., Inc. (hereinafter "Brightman"), is a Delaware corporation, having a place of business at 10411 Baur Blvd., St. Louis, Missouri.
5. Emerson was organized and began to do business in 1890 under the name "The Emerson Electric Manufacturing Company". At that time Emerson sold principally electric fans and motors. The name was subsequently changed to "Emerson Electric Company".
*671 6. For more than thirty-five (35) years Emerson has been marketing nation-wide a line of electric heating products. These include, inter alia, portable baseboard heaters, installed baseboard heaters, wall heaters, storage heating systems and fan heater/swag lights, all of which are used primarily to heat rooms in homes. Also used in homes are Emerson's thermostats, heat controls, and heating tape and cable. Emerson also makes and sells unit heaters, cabinet heaters, infrared heaters, convectors and heat fans to provide heat in a wide variety of locations, including, inter alia, apartments, offices, stores, schools and factories.
7. During the early 1970's Emerson marketed portable kerosene and propane heaters for industrial uses, but sales of these heaters were discontinued before 1979. In both 1979 and 1981 Emerson considered marketing portable kerosene heaters for use in the home. On both occasions Emerson elected not to market kerosene heaters because of the safety risks involved. The uncontradicted testimony of Emerson's Assistant Treasurer, Mark Proudfoot, established that accidents arising out of the use of portable kerosene heaters, if sold by Emerson, would likely have a negative impact on Emerson.
8. Emerson is a large, diversified company with sales of approximately $3.5 billion under the "Emerson" trademarks or trade names. Emerson sells a wide variety of products under the "Emerson" trademarks or trade names to consumers, industry and the government. Emerson is well known nation-wide.
9. Emerson's portable baseboard heaters and fan heater/swag lights are sold to consumers primarily through retail outlets such as home centers building supply centers, hardware stores, mass merchandise stores and discount stores. Emerson's heating tape and cable are also sold through these retail outlets. The Emerson PBH 1204 and PBH 602, portable baseboard heaters, sell at retail for about $89.00 to $99.00 and $59.00 to $69.00, respectively.
10. Emerson's other space heaters and heating products are sold primarily through electrical wholesale distributors to contractors, who install the products in homes and the other locations where the products are used.
11. Emerson's heating products are advertised or promoted by one or more of the following methods:
(a) a nation-wide consumer cooperative advertising program through which retailers and distributors receive a credit of up to 3% of the heater purchase price for local advertising of Emerson's heating products in newspaper, magazine, radio and television advertisements and other advertising media directed to consumers;
(b) printed admats provided by Emerson for use by local retailers and distributors in advertising Emerson heating products which highlight the "quiet ... heat" provided by Emerson's space heaters and their use to save money on fuel bills; and
(c) promotional materials sent to the trade, including bulletins, brochures and catalogs that are shown or given to consumers by retailers and distributors.
12. Emerson has for many years used and continues to use the trademark "EMERSON", alone or together with other words or symbols including "E" with a lightning bolt and "HEAT FAN" (hereinafter "the Emerson marks"), on its heating products; on packaging or labels for its heating products; and in advertising and promotional materials for its heating products. The Emerson marks invariably have been printed in plain block letters. When affixed to the Emerson PBH 1024 and Emerson PBH 602 portable baseboard heaters, the Emerson mark has appeared in plain block letters within a rectangular box.
13. Emerson has for many years used and continues to use tradenames incorporating the word "EMERSON", including "EMERSON ELECTRIC CO." and "EMERSON ENVIRONMENTAL PRODUCTS" (hereinafter "the Emerson names"), in connection with its heating products *672 business. These tradenames are printed in plain block or Roman letters.
14. Emerson is the owner of United States Trademark Registrations Nos. 111,931; 932,239; 942,645; and 957,704 for the Emerson marks, and of the goodwill of the business of marketing products, including heaters, connected with the use of and symbolized by each of those registered marks. Each of Emerson's registrations is in full force and effect. Because Emerson has complied with all of the requirements of 15 U.S.C. § 1065 with respect to Emerson's Registrations Nos. 932,239; 942,645; and 957,704, these registrations are conclusive evidence of Emerson's incontestable right to use the trademarks recited in the registrations. United States Trademark Registration No. 932,239 is for the mark "EMERSON" in block letters and the symbol "E" with a lightning bolt logo on the symbol. The products covered by this registration include, inter alia, "electric air heaters, wall mounted air heaters, convection type air heaters, baseboard heaters, finned duct type air heaters."
15. From 1973 through 1982, net revenues to Emerson from the sale of heating products identified by the Emerson marks and names have exceeded $190 million, of which $150 million have been sales of space heaters. During the same period, Emerson spent approximately $5 million to advertise and promote its heating products identified by the Emerson marks and names throughout the United States. This figure includes $60,000.00 to $70,000.00 per year spent directly for consumer cooperative advertising.
16. Packaging and advertising for many of Emerson's heating products identified by the Emerson marks and names have used the words "quiet ... heat". As early as 1947, Emerson used the word "quiet" in connection with its portable space heaters and since that time Emerson has continued to use "quiet" alone as well as with "heat".
17. Long before defendants began to use "EMERSON QUIET HEAT" for heaters, the Emerson marks and names were widely used and had acquired a secondary meaning, indicating a single source of quality heating products. "EMERSON" is a strong mark and name for heating products.
18. Emerson Quiet Kool has manufactured and sold air conditioners and dehumidifiers for several years under the mark "EMERSON QUIET KOOL". National Union is the owner of several United States Trademark Registrations for the following marks and products:
(a) "EMERSON" and clef design for watches, radios, phonographs, stereos, and air conditioners (Nos. 1,111,724; 855,479; 527,505; 409,629; 616,211);
(b) "EMERSON QUIET KOOL" for air conditioners (No. 1,119,176);
(c) "QUIET KLEEN" and design for vacuum cleaners (No. 875,046);
(d) Stylized "E" for motor fans and bags for vacuum cleaners, and air conditioners (Nos. 891,132; 1,113,519; 1,113,995);
(e) "EMERSON" for tape recorders and accessories therefor (No. 799,308); and
(f) "EQK" for air conditioners (No. 1,039,617). National Union's use of "EMERSON" and clef design for watches and "EMERSON QUIET KOOL" for air conditioners, is pursuant to agreements between Emerson and National Union, dated August 17, 1978, and June 30, 1977, respectively, whereby Emerson withdrew its opposition to National Union's registration of said marks. National Union does not own any federal registration for any mark which contains the word "Emerson" for use in connection with any type of heating product.
19. Emerson Quiet Kool decided to enter the space heater market in 1982 because the heaters would be sold at the season opposite from the company's basic product (air conditioners). To this end, Emerson Quiet Kool entered into an agreement with Sharp Corporation of Japan (hereinafter "Sharp") to import three (3) models of kerosene space heaters which Sharp was already selling in this country through other companies under the names *673 "Radiant King" and "Aladdin". Emerson Quiet Kool was able to specify only cosmetic and name changes on the heaters, packaging and operators' manuals, including the selection of a trademark for the heaters.
20. Emerson Quiet Kool began to import Sharp's heaters in sealed cartons in May or June, 1982. In August or September, 1982, Emerson Quiet Kool began to resell the imported heaters commercially without ever having opened the sealed carton. During the 1982-1983 season, Emerson Quiet Kool sold 20,000 heaters, of which 6,000 were sold to consumers. Emerson Quiet Kool shipped 100 of its kerosene heaters to Brightman in St. Louis in early 1983. Brightman sold three of these to Denton Appliance Sales & Service in March or April 1983.
21. Emerson Quiet Kool selected "EMERSON QUIET HEAT" as the trademark for its heaters, and National Union attempted to register that mark in the United States Patent and Trademark Office in March, 1982, and May, 1983.
22. Defendants display the mark "EMERSON QUIET HEAT" in plain block letters in a rectangular box with a flame logo on their heaters, the packaging, the operators' manuals, printed specifications, and advertising and promotional materials for their heaters. These displays of the mark "EMERSON QUIET HEAT" appear very similar to the displays of Emerson's marks and names.
23. Emerson Quiet Kool approved credit returns and several ads, including radio scripts, for its heaters which use "EMERSON" as the only indicator of source or as an abbreviation of "EMERSON QUIET HEAT". Brightman used "EMERSON" alone to designate defendants' heaters on all of its invoices for those heaters. Emerson Quiet Kool's market research firm, Storm Marketing Research, Inc., used "EMERSON" alone to designate defendants' heaters in the "Survey On Kerosene Heater Distribution", which it prepared for Emerson Quiet Kool in November, 1982.
24. "Emerson" is the distinctive word in the "EMERSON QUIET HEAT" mark. Both the words "Quiet" and "Heat" are primarily descriptive because the heaters are quiet in operation and provide heat.
25. Kerosene heaters are a type of space heater, and kerosene heaters compete directly with other space heaters, including electric heaters. The evidence adduced at trial did not establish that there is a segment of the consuming market which demands non-electrical space heaters and will not even consider plaintiff's electric heaters in choosing a space heater. Kerosene space heaters, like Emerson's electric space heaters, are used to heat a wide variety of spaces, including homes, garages, offices and farm buildings. Kerosene space heaters, including Emerson Quiet Kool's heaters, are moderately priced. Emerson Quiet Kool's heaters sold for less than the $149.00, $159.00 and $219.00 retail prices Emerson Quiet Kool originally suggested. Brightman sold Emerson Quiet Kool's heaters for $94.00, $99.00 and $133.00 in March and April, 1983.
26. Portable kerosene space heaters differ from other portable space heaters in that portable kerosene space heaters pose a safety risk in terms of fire. There is widespread concern among consumers and retailers regarding the safety of portable kerosene heaters. The magazine Consumer Reports has recommended that consumers purchase portable electric heaters rather than portable kerosene heaters because of the risks inherent in kerosene heaters.
27. The Emerson Quiet Kool heaters are in direct competition with Emerson heating products bearing the Emerson marks and names, and pose a threat to the goodwill and reputation of Emerson associated with those marks and names.
28. Kerosene space heaters are sold to consumers through the same types of retail establishments as other space heaters, such as electric heaters, including, inter alia, hardware stores, discount stores, home improvement centers, and appliance stores. Emerson Quiet Kool sells its heaters through these retail outlets. Emerson Quiet *674 Kool has made the majority of its heater sales directly to retailers, but also sells them to distributors. Brightman is a distributor in St. Louis through which Emerson Quiet Kool has already sold some of its kerosene heaters.
29. Emerson Quiet Kool advertises and promotes its heaters to consumers by methods that are very similar to the methods by which Emerson advertises its electric heaters, see Findings of Fact No. 11, including a nation-wide cooperative advertising program, printed admats, consumer handouts that are provided to retailers, direct consumer advertisement, and retail displays. Said advertising emphasizes the "quiet heat" provided by kerosene space heaters and their use to save money on fuel bills.
30. Emerson and Emerson Quiet Kool use similar channels of trade and similar types of advertising to market their heaters.
31. Emerson Quiet Kool and National Union possessed actual knowledge of Emerson's use of "EMERSON" for its portable space heaters when those entities selected "EMERSON QUIET HEAT" for their competitive kerosene space heaters. All of defendants' heaters were sold between August, 1982, and June, 1983, after Emerson Quiet Kool received an objection to the use of "EMERSON QUIET HEAT" from Emerson in June, 1982.
32. Emerson Quiet Kool's use of "EMERSON", in the mark "EMERSON QUIET HEAT", in connection with the sale of its kerosene heaters is likely to cause confusion as to the source of the heaters. There has been, and continues to be, widespread confusion resulting from the activities of Emerson Quiet Kool and Emerson Radio Corp. For example:
(a) Emerson has received many oral and written inquiries from individuals throughout the nation who have mistakenly believed that Emerson makes products which are actually marketed by Emerson Quiet Kool or Emerson Radio Corp., such as air conditioners, radios, and phonographs. Some of these inquiries have not only attributed products of Emerson Quiet Kool and Emerson Radio Corp., products that Emerson does not manufacture to Emerson, but have also blamed Emerson for the poor quality or performance of those products or poor service.
(b) Retailers have mistakenly identified Emerson as the source of products marketed by Emerson Quiet Kool and Emerson Radio Corp.
(c) Stock analysts, other members of the investment community, and the news media throughout the nation have confused Emerson Quiet Kool and Emerson Radio Corp. with Emerson, and have assumed that Emerson is marketing the products of Emerson Quiet Kool and Emerson Radio Corp.
33. All of the evidence of record concerning actual confusion establishes that products of Emerson Quiet Kool and Emerson Radio Corp. have been attributed to Emerson, even though neither Emerson Quiet Kool nor Emerson Radio Corp. was marketing products in direct competition with Emerson products. The evidence adduced at trial did not support a finding that the public is aware that there is more than one company using the mark "EMERSON" on its products or that the consuming public will equate the mark "EMERSON QUIET HEAT" with National Union rather than Emerson.
34. On March 26, 1982, National Union filed an application with the United States Patent and Trademark Office, Serial No. 356,656, to register "EMERSON QUIET HEAT" and Design as National Union's trademark for heaters. The application presents "EMERSON QUIET HEAT" in block letters in a rectangular box, with a flame logo to the left in an attached box. In this application, National Union gave February 4, 1982, as the date of first use in commerce of the "EMERSON QUIET HEAT" mark for heaters. However, as of February 4, 1982, National Union's only use of "EMERSON QUIET HEAT" was a shipment of a sample Sharp heater from Emerson Quiet Kool to Frank Fendell's Appliance in Philadelphia, Pennsylvania. Said shipment was solely for trademark application *675 purposes, and Emerson Quiet Kool neither charged for the heater nor intended that the heater be resold to a consumer.
35. On March 15, 1983, the United States Patent and Trademark Office passed National Union's application for publication.
36. On May 6, 1983, Emerson filed a Notice of Opposition to National Union's application serial number 356,656 in the United States Patent and Trademark Office.
37. On May 9, 1983, National Union filed another application with the United States Patent and Trademark Office, Serial No. 73/425,058, to register "EQH-EMERSON QUIET HEAT" and Design as National Union's trademark for heaters. This second application was based on a single April 14, 1983, shipment to Frank Fendell's Appliance under the same conditions as the February 4, 1982, shipment. See Finding of Fact No. 34. Defendants have made no other use of "EQH-EMERSON QUIET HEAT" and Design.
38. On August 8, 1983, the Trademark Trial and Appeal Board set September 17, 1983, as the date when National Union's answer to the opposition notice was due. Emerson moved to stay the opposition, pending the outcome of this litigation, on August 13, 1983. No decision concerning registration of "EMERSON QUIET HEAT" and Design has been reached by the Trademark Trial and Appeal Board to date. National Union's second application for registration has not yet been passed to publication by an examiner.
39. Defendants did not use "EMERSON QUIET HEAT" for any product until they began to use it in connection with heaters in 1982. Defendants have no plans to use "EMERSON QUIET HEAT" with any product other than heaters.
40. Both Emerson's and defendant's heaters are different from, and do not directly compete with, air conditioners or dehumidifiers that contain heating elements. One of the reasons that Emerson Quiet Kool decided to market its space heaters was because the space heaters would be sold at the season opposite from its basic product, air conditioners. Although some air conditioners and dehumidifiers contain heating elements, they are sold at different times of the year from space heaters. Several professional marketing reports admitted into evidence do not list air conditioners or dehumidifiers among the products which compete with space heaters.
41. Each of National Union's existing federal trademark registrations is for a mark other than "EMERSON QUIET HEAT" and for products other than heaters. Emerson's federal trademark registration number 932,239 is for the mark "EMERSON", the block logo "E" with a lightning symbol on it, and is for many types of heating products including "electric air heaters."
42. When Emerson Quiet Kool and National Union attempted to adopt "EMERSON QUIET HEAT" for heaters, none of the defendants were aware of any use of "EMERSON" for heaters other than the use by Emerson, and there was no evidence of any such third-party use today.

II. CONCLUSIONS OF LAW:
This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1338 and 15 U.S.C. §§ 1121, 1125(a), and over the parties. This Court has pendent jurisdiction over plaintiff's state law claims. Jordan K. Rand, Ltd., v. Lazoff Bros., Inc., 537 F.Supp. 587, 593 (D.Puerto Rico 1982). Venue is proper under 28 U.S.C. § 1391(b), (c).
This case concerns the right of defendants to use the mark "EMERSON QUIET HEAT" in connection with the sale of kerosene space heaters. Plaintiff alleges that defendants' use of "EMERSON QUIET HEAT" in connection with the sale of kerosene space heaters infringes its federally registered trademark, "EMERSON" and logo, for the sale of electric space heaters. In addition, plaintiff alleges that defendants' use of "EMERSON QUIET HEAT" on kerosene space heaters constitutes false designation of origin, in violation of 15 *676 U.S.C. 1125(a), common law unfair competition, and violation of the Missouri anti-dilution statute, § 417.061, R.S.Mo. Defendants argue that it is entitled to use the mark "EMERSON QUIET HEAT" in connection with the sale of kerosene space heaters, because such a use is a logical extension of its use of the mark "EMERSON QUIET KOOL" in connection with the sale of air conditioners and humidifiers. In addition, defendants contend that there is no likelihood of confusion among consumers as to the source of defendants' kerosene space heaters, because: 1) the marks, "EMERSON QUIET HEAT" and logo, and "EMERSON" and logo, are neither identical nor similar; 2) kerosene heaters do not compete directly with electric space heaters; 3) the public is aware that there is more than one company using the name "Emerson" on its products; and 4) the public will equate the mark "EMERSON QUIET HEAT" with defendant National Union rather than plaintiff.

A. Plaintiff's Right To Relief

In an action for infringement, false designation of origin and unfair competition, plaintiff must establish two essential elements: 1) ownership of a distinctive mark or name; and 2) defendant's use of a similar mark or name is likely to cause confusion as to the source of the products sold by defendant. D C Comics, Inc., v. Powers, 465 F.Supp. 843, 846 (S.D.N.Y. 1978). It is the opinion of this Court that plaintiff has established both elements. Therefore, unless defendants' defenses are meritorious, plaintiff is entitled to the relief it requests.
First, plaintiff owns the right to market its electric heating products under the mark "EMERSON". Plaintiff's United States Trademark Registration No. 932,239 extends federal protection to the mark "EMERSON" and the logo "E" with a lightning symbol, to a wide variety of electric space heating products. See Finding of Fact No. 14. A United States Trademark Registration of a mark is prima facie evidence that the registrant owns a distinctive mark and, therefore, has acquired secondary meaning. Markel v. Scovill Mfg. Co., 471 F.Supp. 1244, 1249 (W.D.N.Y.) aff'd without op. 610 F.2d 807 (2d Cir. 1979); Armstrong Cork Co. v. Armstrong Plastic Covers Co., 434 F.Supp. 860, 870-71 (E.D.Mo.1977). Moreover, plaintiff has complied with 15 U.S.C. § 1065 and § 1115(b) with respect to Registration No. 932,239. See Findings of Fact Nos. 9-14. Therefore, said registration is "conclusive evidence of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified" in the registration. 15 U.S.C. § 1115(b).
The ultimate issue on plaintiff's infringement claim is whether defendants' use of "EMERSON QUIET HEAT" on its kerosene space heaters is likely to cause confusion as to the source of defendants' products. Whether use of a particular mark is likely to cause confusion turns on an analysis of several factors set out in SquirtCo v. Seven-Up Co., 628 F.2d 1086 (8th Cir.1980). These include: 1) the similarity of the marks; 2) the similarity and competitive proximity of the products; 3) the relationship between the parties' channels of trade; 4) the relationship between the parties' advertising; 5) the classes of, and the degree of care likely to be exercised by, prospective purchasers; 6) evidence of actual confusion; 7) defendants' intent in adopting the mark; and 8) the strength of plaintiff's mark. Id. at 1091. See also Jordan K. Rand, Ltd., 537 F.Supp. at 595-96; Armstrong Cork Co., 434 F.Supp. at 871. Applying these factors to the case at bar, it is the conclusion of this Court that defendants' use of the mark "EMERSON QUIET HEAT" in connection with the sale of kerosene space heaters is likely to cause confusion as to the source of said heaters.
With respect to the similarity of the marks, it is true that the marks are not identical. Defendants' mark contains the additional words "quiet heat", and the logo utilized by both parties is different. Plaintiff uses a lightning logo and defendants *677 use a flame logo. However, the words "quiet heat" are merely descriptive when used in connection with the sale of kerosene space heaters. See Finding of Fact No. 24. Descriptive words do not serve to distinguish the source of products. Markel, 471 F.Supp. at 1250; Bass Buster, Inc. v. Gapen Manufacturing Company, Inc., 420 F.Supp. 144 at 160. See also Little League Baseball v. Daytona Beach Little League, 193 U.S.P.Q. 611, 614 (M.D.Fla. 1977) ("one cannot take the trademark of another and by adding thereto descriptive or subordinate matter, avoid a likelihood of confusion or mistake or deception.") Moreover, there was no evidence adduced at trial to indicate that the words "quiet heat", when used by defendants on kerosene space heaters, have acquired secondary meaning in the space heater market. Plaintiff uses the words "quiet" and "heat" on many of its advertisements and admats. See Finding of Fact No. 16. Therefore, the only distinctive portion of defendants' mark, the word "Emerson", is identical to plaintiff's mark. See Finding of Fact No. 24. As stated in Queen Mfg. Co. v. Isaac Ginsberg & Bros., 25 F.2d 284 (8th Cir. 1928):
In order to constitute an infringement it is not necessary that the trademark be literally copied. Neither is it necessary that every word be appropriated. There may be infringement where the substantial and distinctive part of the trademark is copied or imitated.
Id. at 287 (citations omitted) (quoted in Jordan K. Rand, Ltd., 537 F.Supp. at 595).
Although the logos used in connection with each mark are different, they are both a small part of the entire marks and there was no indication at trial that either logo has the effect on consumers of distinguishing the source of the products. Consumers cannot be expected to draw fine distinctions between marks under actual market conditions. SquirtCo v. Seven-Up Co., 207 U.S.P.Q. 12, 20, 480 F.Supp. 789 (E.D.Mo. 1979), aff'd, 628 F.2d 1086 (8th Cir.1980); Armstrong Cork Co., 434 F.Supp. at 871. The size and shape of the logos are not so distinct as to be easily distinguishable. In addition, defendants have, on occasion, used "Emerson" alone to designate their heaters. See Finding of Fact No. 23. Therefore, defendants' mark is very similar to plaintiff's mark. See Finding of Fact No. 22.
Although infringement may be found in the absence of direct competition, SquirtCo, 628 F.2d at 1091, the similarity and competitive proximity of the products is an important factor in determining likelihood of confusion. "[T]he greater the similarity between the products, the greater the likelihood of confusion." Jordan K. Rand, Ltd., 537 F.Supp. at 595 (citations omitted). See Markel, 471 F.Supp. at 1251. In the case at bar the products are not identical, but they are direct competitors. See Findings of Fact Nos. 25, 27. Defendants argue that they are not in direct competition, because consumers buy kerosene heaters so that they don't have to use electricity. Even if this is true, it does not negate the fact that kerosene space heaters compete directly with electric space heaters. Both types of heaters are used to heat similar kinds of spaces and structures, and both types of heaters are sold during the same time of the year and through similar channels. See Findings of Fact Nos. 6, 9, 25, 28. Moreover, the evidence adduced at trial did not establish that there is a segment of the consuming market which demands non-electrical space heaters and will not even consider plaintiff's heaters in choosing a space heater. See Finding of Fact No. 25. Finally, plaintiff's heaters and defendants' heaters are competitive in terms of price. See Findings of Fact Nos. 9, 25.
The parties' channels of trade and the methods of advertising are also very similar. See Findings of Fact Nos. 9, 11, 12, 16, 28, 29, 30. In addition, the classes of prospective purchasers are the same for the parties' heaters. See Finding of Fact No. 25. Because the prices of the parties' heaters are moderate, in the $90.00-$100.00 range, consumers are not likely to exercise a great deal of care in distinguishing plaintiff's heaters from defendants' heaters. Armstrong Cork Co., 434 F.Supp. at 871; *678 Markel, 471 F.Supp. at 1251. In this regard, "[w]hat is required [to show likelihood of confusion] is that the ordinary purchaser, generally familiar with plaintiff's mark, is likely to believe that defendant's products are somehow related to, associated with, or sponsored by the same people or entity that produces" plaintiff's products. Jordan K. Rand, Ltd., 537 F.Supp. at 595. Defendants argue in their post-trial brief that consumers will make a distinction because the public is aware that there is more than one company using the mark "Emerson" on its products and that the public will equate the mark "EMERSON QUIET HEAT" with defendant National Union rather than plaintiff. However, defendants' argument is not only not supported by the evidence adduced at trial, but such evidence points directly to a contrary conclusion. See Findings of Fact Nos. 32, 33. The evidence adduced at trial established that the public often attributes to plaintiff goods sold by defendantsgoods of a type and class which plaintiff does not manufacture. The inference is that such confusion will be even greater where plaintiff does make competitive products, and sells and advertises them in ways that are similar to defendants' trade channels and methods of advertising.
Another important factor in determining whether there is a likelihood of confusion, is the presence or absence of actual confusion. "[T]he presence of actual confusion is strong evidence of the likelihood of confusion." Markel, 471 F.Supp. at 1251. In the case at bar there was no evidence of actual consumer confusion in the space heater market. The absence of such evidence can probably be explained by the fact that defendants' sales of its heaters have not yet become significant. See Finding of Fact No. 20. However, there was evidence that consumers, retailers, stock analysts and other members of the investment community, and the news media, have often confused the parties and their products. See Findings of Fact Nos. 32, 33. With respect to consumers and retailers, this confusion took the form of attributing to plaintiff products made and sold by defendants. See Finding of Fact No. 32(a), (b). With respect to the others, this confusion took the form of confusing the parties and their products. See Finding of Fact No. 32(c). Although not dispositive, this Court finds this evidence to be highly persuasive on the question of likelihood of confusion. It is the opinion of this Court that this evidence of actual confusion with respect to products made by defendants, where plaintiff did not make a competitive product, strongly suggests that confusion is likely to occur in a market where plaintiff makes directly competitive products. See Finding of Fact No. 33.
Intent is not an element of a claim for trademark infringement, SquirtCo, 628 F.2d at 1091, but the deliberate adoption and use of a mark similar to another's mark gives rise to an inference that confusion is likely to occur. Markel, 471 F.Supp. at 1252. In the case at bar, defendants possessed actual knowledge of Emerson's use of "EMERSON" for the sale of electric space heaters and defendants sold their heaters after receiving Emerson's objection. See Finding of Fact No. 31.
The final factor to consider is the strength of plaintiff's mark. Stronger marks are accorded more protection from a likelihood of confusion than are weaker marks. Jordan K. Rand, Ltd., 537 F.Supp. at 596. It is the opinion of this Court that the mark "EMERSON", when used in connection with the sale of electric space heaters, is distinctive and, thus, a strong mark. See Finding of Fact No. 17. This mark has been used in the sale of electric space heaters for more than thirty-five (35) years. See Finding of Fact No. 6. Its distinctive quality has been fostered by advertising, see Finding of Fact No. 11, continuous use, see Findings of Fact Nos. 12, 13, federal registration, see Finding of Fact No. 14, and millions of dollars of sales, see Finding of Fact No. 15. Its strength and distinctive quality are also conclusive by virtue of 15 U.S.C. §§ 1065, 1115(b). See Findings of Fact Nos. 9-14. Finally, there is no evidence that anyone other than Emerson has used "EMERSON" *679 in connection with space heating products. See Finding of Fact No. 42.
Based on the foregoing analysis, it is the conclusion of this Court that defendants are infringing plaintiff's trademark in violation of 15 U.S.C. § 1114(1). Defendants' use of the mark "EMERSON QUIET HEAT" is also unlawful under the principles of unfair competition and constitutes false designation of origin in violation of 15 U.S.C. § 1125(a). Armstrong Cork Co., 434 F.Supp. at 871-72. See also Truck Equipment Service Company v. Freuhauf Corporation, 536 F.2d 1210 (8th Cir.1976); Heaton Distributing Co. v. Union Tank Car Company, 387 F.2d 477, 483 (8th Cir. 1967). "The same facts supporting a suit for trademark infringement will support a suit for unfair competition." Jordan K. Rand, Ltd., 537 F.Supp. at 597.
It is also the opinion of this Court that defendants' use of the mark "EMERSON QUIET HEAT" violates Missouri's anti-dilution statute, § 417.061, R.S.Mo. Section 417.061 provides:
Likelihood of injury to business reputation or of dilution of the distinctive quality of ... a mark valid at common law, or a trade name valid at common law, shall be ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.
§ 417.061, R.S.Mo. As discussed above, the mark "EMERSON", for electric space heaters is both strong and distinctive. See Findings of Fact Nos. 9-14, 17. Because there is a likelihood of confusion as a result of defendants' use of "EMERSON QUIET HEAT", see Finding of Fact No. 32, defendants' use is likely to cause a dilution of the distinctive quality of plaintiff's mark. There is also a strong likelihood of injury to plaintiff's business reputation as a result of defendants' use of the mark "EMERSON QUIET HEAT" for kerosene heaters. Kerosene space heaters pose a very real safety hazard when used improperly, see Findings of Fact Nos. 7, 26, and the likelihood of confusion, when coupled with the risk of accidents, creates a likelihood that plaintiff's reputation will be injured by defendants' activity. See Finding of Fact No. 7. Plaintiffs deliberately chose not to enter the kerosene space heater market due to the risks associated with such heaters and defendants' activities would expose plaintiff to said risks. See Finding of Fact No. 7.
Defendants' defenses are somewhat vague, but defendants argue that they are entitled to use the mark "EMERSON QUIET HEAT" because defendants used the mark "EMERSON QUIET KOOL" in connection with the sale of air conditioners and dehumidifiers for many years prior to their entry into the space heater market. This Court does not find defendants' argument persuasive for several reasons. First, defendants' use of "EMERSON QUIET KOOL" on air conditioners and dehumidifiers is distinguishable because Emerson does not make products which compete in the air conditioner or dehumidifier markets. Second, even though some of defendants' air conditioners and dehumidifiers have heating elements, those products do not compete with space heaters, whether they be electric or kerosene space heaters. See Finding of Fact No. 40. Finally, defendants use the mark "EMERSON QUIET KOOL" pursuant to an agreement between Emerson and defendants by which Emerson has consented to said use by defendants. See Finding of Fact No. 18. Defendants' use of marks other than "EMERSON QUIET HEAT" for products other than heaters does not justify their use of "EMERSON QUIET HEAT" for heaters. Standard Oil Co. v. Standard Oil Co., 252 F.2d 65, 77 (10th Cir.1958); Blaw-Knox Company v. Siegerist, 300 F.Supp. 507, 512 (E.D.Mo.1968), aff'd, 414 F.2d 375 (8th Cir.1969). Therefore, defendants' rights in the mark "EMERSON QUIET KOOL" do not give defendants the right to encroach and infringe on plaintiff's incontestable right to use the mark "EMERSON" in connection with electric space heaters.
Defendants' protestations that plaintiff is attempting to gain a monopoly *680 over the mark "EMERSON" is also not well-taken. Plaintiff does have a superior and prior right to use the mark "EMERSON" in connection with electric space heaters. This Court's decision prevents only defendants' use of a similar mark on a competing product from causing confusion and damaging plaintiff's rights. However, this Court's decision is so limited and any monopoly which plaintiff gains thereby is granted to it by law. This decision does not affect the parties' respective rights as to other products or marks.
Defendants also argue that their use of "EMERSON" in "EMERSON QUIET HEAT" is another example of the long use by different businesses of marks which include the surname "Emerson", and that it would impose a tremendous burden on defendants to force them to cease using their well-established mark. However, there was no evidence of long use by other businesses, of the burden on defendants to cease using the mark on kerosene space heaters, or of the "well-established" quality of defendants' mark for heaters. Accordingly, these arguments are without merit.
Defendants also place strong reliance on two (2) cases which this Court finds inapposite. For example, Emerson Electric Mfg. Co. v. Emerson Radio & Phonograph Corp., 24 F.Supp. 481 (S.D.N.Y.1938), which held that defendant Emerson Radio could use "EMERSON" and clef for radios and phonographs, is not apposite because plaintiff Emerson Electric did not make or sell "products similar to or competitive with" radios and phonographs. Id. at 487. The case at bar involves use of a similar mark on products which are similar and directly competitive. Likewise, in Federal Telephone & Radio Corp. v. Federal Television Corp., 180 F.2d 250 (2d Cir.1950), defendant was allowed to use the mark "Federal" in connection with the sale of televisions where plaintiff did not manufacture televisions, but radios. In addition, in Federal Telephone, there was no evidence that defendant's sale of televisions would damage plaintiff's reputation, defendant had already acquired the goodwill of the mark, defendant adopted the mark in good faith, and the mark was a word in general use. Id. at 251. In the case at bar, of course, there is evidence that defendants' activity will damage plaintiff's reputation, see Findings of Fact No. 7, defendants' sales have not been substantial, see Finding of Fact No. 20, the mark was not adopted in good faith, see Findings of Fact No. 31, and it is not a word in general use, see Finding of Fact No. 17.

B. Plaintiff's Relief

The relief sought by plaintiff is a permanent injunction. Such relief is authorized by 15 U.S.C. § 1116, the common law of unfair competition, and the Missouri anti-dilution statute, § 417.061, R.S.Mo. Issuance of injunctive relief requires a consideration of whether plaintiff will suffer irreparable injury absent the injunction and a balancing of the relative hardships on the parties. Dataphase Systems, Inc., v. C.L. Systems, Inc., 640 F.2d 109, 112 (8th Cir. 1981). See also Jordan K. Rand, Ltd., 537 F.Supp. at 597.
"A finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears." Jordan K. Rand, Ltd., 537 F.Supp. at 597 (citation omitted). In the case at bar, both are present. There is a strong likelihood of confusion, see Findings of Fact Nos. 32, 33, and there is a risk that Emerson's reputation will be damaged by the safety risks associated with defendants' kerosene heaters. See Findings of Fact Nos. 7, 26, 27.
The balance of the relative hardships of the parties weighs heavily in favor of plaintiff. Without an injunction, plaintiff will be subjected to the irreparable injury discussed above. Moreover, requiring defendants to forego use of "EMERSON QUIET HEAT" will not result in any undue burden on defendants. Defendants did not enter the space heater market until 1982 and their sales to date have not been substantial. See Findings of Fact Nos. 19, 20, 39. Therefore, the hardship on defendants will not be great and does not warrant denial of *681 injunctive relief. An injunction is appropriate.
It is the opinion of this Court that, in addition to enjoining defendants from infringing plaintiff's trademark, defendants must also be ordered to abandon their registration applications for "EMERSON QUIET HEAT". A party may only register a mark which it has the right to use in commerce. Tuvache, Inc., v. Emilio Pucci Perfumes International, 263 F.Supp. 104, 106 (S.D.N.Y.1967). See also 15 U.S.C. § 1119. Finally, plaintiff is entitled to destruction of any of the infringing articles. 15 U.S.C. § 1118.

ORDER AND JUDGMENT
Pursuant to the memorandum filed herein this day,
IT IS HEREBY ORDERED, ADJUDGED and DECREED that defendants, their officers, agents, servants, employees, attorneys and all persons in active concert or participation with defendants or with any of the foregoing are hereby restrained and enjoined from:
(a) using or registering "EMERSON", or any word or combination of words containing "EMERSON" or a word similar to "EMERSON", as a part of any trademark, service mark or trade name, or other product or commercial identification, in connection with the sale, offering for sale, distribution, advertising, promotion or marketing of kerosene space heaters;
(b) representing by words or conduct that any product made, offered for sale, sold or distributed by defendants, or any of them, is authorized, sponsored or endorsed by, or otherwise connected with Emerson Electric Company; and
(c) using or applying to register in connection with the sale, offering for sale, distribution, advertising or promotion of any kerosene space heater, any label, print, wrapper, receptacle, bottle, container, display, advertisement, radio or television commercial, or printed matter, or material in any medium which displays or includes any colorable imitation or simulation of any of the marks or names owned by Emerson Electric Company.
IT IS FURTHER ORDERED, ADJUDGED and DECREED that defendant National Union Electric Corporation shall forthwith:
(a) abandon application Serial No. 356,656 filed in the United States Patent and Trademark Office to register "EMERSON QUIET HEAT" and design as a trademark;
(b) abandon application Serial No. 73/425,058 filed in the United States Patent and Trademark Office to register "EQH-EMERSON QUIET HEAT" and design as a trademark; and
(c) cancel any other registration, and abandon any other application for registration, of "EMERSON QUIET HEAT" as or as part of a trademark or service mark.
IT IS FURTHER ORDERED, ADJUDGED and DECREED that defendants shall:
(a) destroy all signs, containers, advertisements, promotional material, radio or television scripts, printing devices, business forms and other things, in the possession or under the control of defendants, which display any of the matters described above; and
(b) file with this Court and serve on plaintiff, within forty-five (45) days of the date of this order and judgment, a written report under oath setting forth in detail the manner and form in which defendants have complied with the provisions herein.